Filed: August 16, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON


STATE OF OREGON,

Plaintiff-Appellant,


v.


TERRY LAVELL HAYNES,
aka Terry Levell Haynes,

Defendant-Respondent.


(CC 110531963; SC S060103)


En Banc


On appeal from an order of the Multnomah County Circuit Court under ORS 138.060(2) and ORAP 12.07.


Argued and submitted June 12, 2012.


Jennifer S. Lloyd, Attorney-in-Charge, Criminal Appeals, Salem, argued the cause for plaintiff-appellant. With her on the briefs were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.


Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for defendant-respondent.


DE MUNIZ, J.


The orders of the circuit court are affirmed, and the case is remanded to the circuit court for further proceedings.

DE MUNIZ, J.

Defendant is charged with murder and manslaughter. Defendant filed two pretrial motions to exclude evidence, the first seeking to exclude evidence of five allegations of prior bad acts, and the second seeking to exclude defendant's interview with the police. The trial court granted in its entirety defendant's motion to exclude defendant's prior bad acts, and granted in part and denied in part defendant's motion to exclude the police interview. The state seeks direct review of both rulings pursuant to ORS 138.060(2)(a).[1] On review, the state seeks to reverse the trial court's rulings to the extent that the trial court granted defendant's motion to exclude with respect to one of the five alleged instances of prior conduct and granted in part defendant's motion to exclude the interview. Defendant, for his part, does not challenge the trial court's order denying in part his motion to exclude the interview, but urges this court to affirm the trial court's orders in all respects. For the reasons stated below, we conclude that the state did not adequately preserve in the trial court any of the arguments that it now advances on appeal with regard to the admissibility of the prior bad acts. In addition, we decline to consider

---

[1] ORS 138.060(2)(a) provides, in part:

"(2) * * * [W]hen the state chooses to appeal from an order listed in paragraph (a) or (b) of this subsection, the state shall take the appeal to the Supreme Court if the defendant is charged with murder or aggravated murder. The orders to which this subsection applies are:

"(a) An order made prior to trial suppressing evidence[.]"

the state's argument with regard to the partial exclusion of the interview because it assigns error to an order that the trial court did not make. We affirm the trial court's orders and remand the case to the trial court for further proceedings.

## I. FACTS

Defendant is charged with committing a murder that is alleged to have occurred on the evening of May 6, 1994. The victim, a 62-year-old man who lived alone in a house on the corner of 7th and Skidmore in Northeast Portland, was discovered dead in his home on the morning of May 8, 1994. The victim's home was in disarray. A table had been overturned, a number of household items were broken and strewn throughout the house, and the refrigerator had been pushed away from the wall and left standing in the middle of the kitchen. The victim's wallet, containing cash, was found submerged in the toilet tank. The medical examiner determined that the victim's death was caused by excessive blood loss as a result of 31 stab wounds, 29 of which were located on the victim's forearms and characterized as "defensive" wounds. The medical examiner opined that none of the wounds would have been independently fatal, but for the severe loss of blood, and also noted that the victim's blood alcohol level was .49 percent at the time of his death.

The police conducted a search of the area surrounding the victim's home and discovered a bloody rag in an adjacent neighbor's shrubbery and a pair of bloodstained khaki pants, canvas shoes, and men's underwear behind a shrub in the yard of a home across the street. The police also interviewed several friends and acquaintances of the victim, who described the victim as a consistently heavy drinker and

prone to inviting strangers, prostitutes, and street people into his home. However, the police were unable to identify any suspects, and the case went cold.

In 2010, a police cold case unit sent the items of clothing that had been found near the crime scene to the Oregon State Police Crime Laboratory for DNA testing. Forensic scientists at the crime laboratory reported that DNA from the bloodstains on the khaki pants and canvas shoes matched the victim's DNA profile, and that a second DNA profile found on the waistband of the khaki pants and on the men's underwear matched defendant's DNA profile. Defendant, who was known to the police from previous encounters, was located and brought to the police station for questioning.

The interview began conversationally. A cold case officer and another officer who apparently was familiar with defendant from previous encounters spoke casually with defendant about his family, where he had gone to high school, where he had been living recently, and a recent run-in that defendant had had with the police. After some time, defendant asked the officers to tell him why he was there. The officers then read defendant his *Miranda* rights and began questioning him about the time period surrounding the murder. The officers asked defendant what he had been doing around 1994. Defendant responded that he could not remember, but he thought he was either in prison or in Job Corps. The officers asked defendant if he remembered knowing anyone named "Raymond" (the victim's name) living in Northeast Portland back in 1994. Defendant responded that he knew a "light skinned dude" named Raymond "from treatment," but could not recall knowing anyone named Raymond who had lived in Northeast Portland. When asked generally whether he ever spent time around the

4

Skidmore area in 1994, defendant volunteered that his sister lives on 7th and Skidmore, but denied knowing or remembering any neighbor of his sister's named Raymond. Defendant told the officers that he had been working the streets and drinking and using drugs back then, and that he really could not remember much from that time period.

The officers then asked defendant (who apparently worked as a cross-dressing prostitute) whether he ever had had any violent encounters with "johns" or whether any "johns" ever had attacked him in a house. Defendant related various encounters in which he had been attacked by "johns," but again denied any memory of anything from 1994, anyone named Raymond, or anything happening around Skidmore Street. When the officers told defendant that there had been a murder and that his DNA was "coming up" at the murder scene, defendant responded, "You know what, I'm a hooker, I, I, I may have…* * * They could, I may have dated the person, I don't, you know what I'm saying, but…* * * I'm not into hurting people. * * * You know, I've, I've had to fight to get away from people trying to harm me, but, you know, hurting people or huh-uh." The officers then asked defendant whether he remembered ever getting arrested with an old man in Vancouver, Washington.[2] Defendant responded, "Yeah, the guy tried to take me out in the woods and he had a gun. * * * I do remember that, the guy had a

---

[2]     A police report indicated that defendant had been pulled over and cited for driving under the influence of intoxicants in Vancouver, Washington, in the early morning hours of May 7, 1994 -- the same night that the police suspected the murder had taken place. The car that defendant had been driving that night belonged to an elderly man who was riding in the passenger seat. That incident is the subject of the state's first assignment of error, and is discussed in further detail below.

gun he tried to take me out in the woods and the reason why I remember that is because they tried to give me 25 years over there. * * * I got a DUI, uh, and I remember from that is that I had, I got, I ended up with a DUI and that's it, but anyway, I'm, you know…"

Defendant then ended the interview by invoking his right to counsel.

## II. PRIOR BAD ACTS

A.    *Procedural Background*

In his motion to exclude prior bad acts, defendant moved to exclude from evidence five allegations of robbery that he thought that the state would seek to admit at defendant's trial. Defendant described the five incidents as follows:[3]

"In the robbery charge from 09/06/1994, [defendant] was accused of walking into a man's office, grabbing a wallet off his desk, punching the victim, and running away. [Defendant] was acquitted by a jury of this charge.

"In the robbery case from 05/06/1994, [defendant] was suspected of entering a man's car while it was stopped at a stop light, threatening the man with violence, and stealing his wallet. Additionally, [defendant] was suspected of forcing the victim to drive to his home. There, [defendant] supposedly met up with an accomplice. [Defendant] and the accomplice were accused of trying to take more money from the victim and then fleeing with the victim when seen by others.

"In the robbery charge from 07/11/1997, [defendant] was alleged to have forced his way into a stopped car. [Defendant] was accused of threatening the driver, stealing his wallet, and running away. The charges against [defendant] were presented to a grand jury and it was not a true bill.

---

[3]    On appeal, the state assigns error to only the part of the trial court's order excluding evidence of the May 6, 1994 incident. However, we include a brief discussion here of all five alleged prior bad acts initially at issue to provide context for the parties' arguments in the trial court.

6

"In the robbery case from 03/28/1998, [defendant] was accused of helping a prostitute rob a client at a motel. [Defendant] was accused of tackling the client and taking his credit card off of the floor. The charges against [defendant] were dismissed.

"Lastly, in the robbery case from 08/29/07, [defendant] was accused of entering a stopped car, threatening the driver with a weapon which the driver never actually saw, hitting the driver, taking his car keys, and fleeing. [Defendant] was acquitted by a jury on this charge."

Defendant argued that evidence of those five incidents should be excluded as

"inadmissible character evidence" under OEC 404(3), which provides that:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In support of that argument, defendant identified three nonpropensity purposes that,

according to defendant, could *not* be used to justify admission of the prior bad acts --

identity, intent, and motive.

The state filed a brief in response that, while styled as a "Memorandum of

Law in Response to Defendant's Motion to Exclude Prior Acts," also purported

affirmatively to move the trial court for an order "allowing the prosecution to admit

evidence of five incidents during which [defendant] took or attempted to take the

property of another person by force." The state substituted two different incidents, both

from 1991, for the first and fourth incidents described in defendant's motion.[4] The state

---

[4] In each of the two substituted incidents, a robbery charge against defendant had been dismissed pursuant to a plea agreement in which defendant had pled guilty to a lesser burglary charge.

7

described the remaining three incidents substantially as defendant had described them in his motion. The state's summary of the May 6-7, 1994 incident was as follows:

> "In the robbery case from May 6, 1994, the defendant was suspected of entering a man's car while it was stopped at a stop light, threatening the man with violence, and stealing his wallet. Additionally, defendant was suspected of forcing the victim to drive to his home. There, defendant supposedly met up with an accomplice. The defendant and the accomplice were accused of trying to take more money from the victim and then fleeing with the victim when seen by others."

Later in its trial brief, as part of a narrative recitation of the facts underlying the current charged offense, and under the representation that, "[t]he State's evidence in the present case can be summarized as follows," the state noted that defendant had been arrested in Vancouver, Washington, on May 7, 1994, at 1:05 a.m., in the company of an elderly man named Early. In that narrative, the state noted that, during that incident, defendant

> "was dressed in a woman's 'jumper' style dress, and he was not wearing underwear, that he had miscellaneous papers, foam, and shrubbery stuffed into a t-shirt he was wearing under the dress in an apparent attempt to appear to have women's breasts. * * * [S]ome of the papers stuffed into [defendant's] t-shirt were registration papers for the vehicle (registered to * * * Early) and bank documents pertaining to Early's bank accounts. [The officer] report[ed] that when she asked [defendant] where he had been driving from, [defendant] responded 'Portland.' [The officer] report[ed] that when she asked [defendant] about * * * Early's accusation that [defendant] had kidnapped Early, [defendant] denied this, but stated that he had met * * * Early in a Portland, Oregon park and later stated that he had met * * * Early in a bar, and that Early had been teaching [defendant] to drive."

However, the state made no indication in its trial court brief that that incident was in any way related to any of the five "prior bad acts" that the state had identified earlier in the brief. Rather, the state's earlier description of the incident that it sought to admit alleged

8

that the incident had occurred on a different date than the incident described in the factual narrative (May 6, 1994, rather than May 7, 1994), and made no mention of the facts that the arrest had occurred in Vancouver, that defendant had been wearing women's clothing stuffed with found objects, or that defendant had not been wearing underwear. The two descriptions differed so substantially that the trial court may not even have understood, at that point, that the incidents were one and the same.

The state made two arguments in its trial court brief. First, the state argued that all five prior bad acts were admissible to show defendant's intent. The state argued that "[t]o determine relevance to *intent*, the question is whether the jury could infer that, because the defendant acted with a certain intent in a different act, he acted with the same intent in the present act." (Emphasis in original.) The state attempted to support that argument solely by demonstrating the similarity of the prior conduct with the charged conduct. The only specific mention the state made of any of the facts relating to the May 6-7, 1994 incident was to argue, pursuant to the third step of the test described in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), that the victims in each prior incident were "in the same class as the victim in the present case," because "[s]everal [of the victims] were particularly vulnerable. Early was 71 years old when he was victimized by [defendant]. [A victim in a separate incident] has developmental delays. The present victim was a late-stage alcoholic and his blood-alcohol content was .49%."

The second and final argument that the state made in its trial brief was that "[t]he prior/subsequent acts are admissible to show the defendant's motive." The state's argument in support of that contention consisted of the following two sentences:

9

"As the defendant points out in his memorandum, the court must undertake an analysis similar to that described above [with regard to the *Johns* test for intent], to determine if the prior/subsequent acts are admissible to show motive. The defendant also (correctly) points out that, for the purpose of motive, the physical elements between the two crimes need not be similar to be admitted."

The state made no attempt to identify any rationale under which the facts of any of the identified bad acts would be logically relevant to prove motive.

At the suppression hearing, the state conceded that its arguments with regard to intent "don't have much merit." The state went on, however, to argue that the prior bad acts should be admitted for two reasons: first, as to all five prior bad acts, to prove motive,[5] and second, with regard to only the May 6-7, 1994 incident, to show defendant's "continuing course of conduct." Although that second argument had not been raised or mentioned in the state's trial court brief, the state contended at the suppression hearing that its position was now "primarily" that the May 6-7, 1994 incident was admissible not as a prior bad act but as evidence of defendant's "continuing course of conduct" on the night of the victim's death:

"[I]t's the State's position primarily that that incident is admissible not because it's a prior bad act as such, but because it's part of a continuing course of conduct of that evening. You know, this homicide, as the [c]ourt will recall, there are some questions about the exact time of the death.

"* * * * *

"* * * [T]here is a lot of evidence in that scenario that has to do with

---

[5]     It appears that the state since has abandoned its motive theory of relevance, as it does not advance any motive argument in this court. We thus have no need to and do not further discuss the basis of that argument here.

10

what the defendant did immediately after, in the State's theory, causing the death of [the victim].

"So it's also evidence of his flight from the State of Oregon, of his continuing course of conduct, which is, the State's theory is that this was a robbery at [the victim's] house, and then there was also this taking of Mr. Early across the state line. And we've got evidence of conduct at Mr. Early's care home and, you know, some physical altercation there.

"There was a question to [defendant] in -- at the Vancouver Police Department about the kidnapping and about the circumstances through which he came into contact with Mr. Early. Yes, it's a prior bad act -- or I guess technically a subsequent bad act to the homicide. But my position is that it's -- that the State's not resting its theory of admissibility of that particular incident solely on a *Johns*-type analysis --

"* * * * *

"-- because it's part of a continuing course of conduct in the State's position."

Those statements marked the first time that the state noted any relation between the first "prior bad act" that it sought to admit and the Vancouver incident described in its brief involving Early, as well as the first time that the state made any argument with regard to the May 6-7, 1994, incident in particular, separately from the other four alleged prior bad acts. Those statements also comprised the state's sole explanation of its new "continuing course of conduct" theory. Other than the remarks set forth above, the state made no attempt to discuss or explain that theory of admissibility or to apply it to the facts of the case.

In response, defendant's counsel noted the state's concession with regard to its intent argument, and focused his arguments primarily on addressing the state's argument on motive. The sole remarks that defendant's counsel made regarding the state's new "continuing course of conduct" theory conceded that that theory might support

11

the admission of certain isolated facts relating to that incident, but contended that it could not support the admission of the entire episode -- including the uncharged allegations of robbery, carjacking, and kidnapping -- as a prior bad act:

> "And then the last thing I wanted to say is about on the argument of continuing course of conduct. Again, it's just -- the problem with it is you -- I guess I would concede this. I think that they would be able to bring in witnesses that said, 'You know what? I saw, this -- that date that this happened, I saw [defendant], and he was with somebody,' or 'he was intoxicated,' or 'he appeared' -- you know, the officers, I think that's what they would testify to, is that he appeared intoxicated to him.

> "I don't think they should be allowed to bring in that Mr. Early was alleging this, that or the other thing.

> "So stuff that is -- percipient witnesses that I then have to cross-examine about what you saw, but I think that's pretty limited. I don't think the State should be able to bring in that Mr. Early charged you with robbery, charged you with these other things.

> "If it's just a simple percipient witness, I don't know that I've got the argument because the argument on these 404, on this *Johns* analysis, on these various things, says it's that allegation of misconduct that the State is offering to say this clears up an element in the case. And that's what I think is prohibited."

The suppression hearing concluded, with neither party making any further remarks regarding the state's "continuing course of conduct" theory.

The trial court issued its first order on the matter one month later. With regard to the prior bad acts issue, the trial court granted defendant's motion to exclude all five prior bad acts, holding that "the state cannot show sufficient factual and legal connection to convince this court that the prior instances of misconduct would be admissible to show intent or motive. This is classic propensity evidence." In identifying the prior bad acts that the state sought to admit, the trial court's order described the May

12

6-7, 1994 incident only as follows:

> "On May 6, 1994, defendant is suspected of entering a man's car while stopped at a light, threatening the man and taking his wallet."

The order did not acknowledge or address the state's "continuing course of conduct" argument in any way.

In response to the trial court's order, the state filed a "Motion for Further Findings of Fact and Rulings of Law," noting that the trial court's order "focus[ed] upon the question of whether the uncharged conduct is relevant to show intent, or to show motive (which is how the parties framed the issue for the court's consideration)," and failed to address the "continuing course of conduct" argument that the state had mentioned at oral argument. The motion asked the trial court for further rulings regarding the relevance of "the particular facts of the defendant's contact with * * * Early, [a nurse at Early's care home], and [the Vancouver police officer] under the more broad tenets of ORE 404(3) -- specifically, that the evidence proffered is relevant to show the defendant's *state of mind* on that evening, and to show that he was acting with a *plan*." (Emphasis added.)

The state had made neither of those arguments as part of its earlier motion to admit evidence of the earlier five incidents. Rather, as noted above, the state did not make a "continuing course of conduct" argument at all in its trial court brief, and in argument had mentioned it only briefly, and at that point had characterized the logical relevance of that evidence as pertaining to "the exact time of the death," "what the defendant did immediately after * * * causing the death of [the victim]," and "his flight

13

from the State of Oregon."  The state made no mention at the hearing of any theory relating to defendant's "state of mind" at the time of the victim's death or to any sort of "plan" that defendant might have formed to cause the victim's death.  Neither did the state advance any analysis in its trial court brief, orally at the suppression hearing, or in its subsequent motion for further findings and rulings as to *how* the proposed conduct could be used to prove defendant's "state of mind" or "plan," or, even if it could, why proof that defendant had acted with a certain state of mind or had formed a particular plan would serve to make the existence of any fact at issue in the murder prosecution any more or less likely.

The trial court issued a second order to "clarif[y]" its first order, noting that "[a]lthough [it] was not requested in the [state's] original motion," "[t]he state now says it also intended to argue that in addition to intent and motive it was seeking admission to show defendant[']s state of mind and his plan."  Despite its statement that the state had not made that argument in the prior proceedings, the trial court went on to consider the merits of the state's argument.  However, the court declined to change its ruling, holding that the May 6-7, 1994 incident was not independently relevant under either of the two theories -- state of mind or plan -- that the state had argued in its motion for further findings and rulings:

> "[T]he other conduct shows that defendant is out drinking and driving with a[n] older man and all other facts mention[ed] above.  It does not indicate that defendant would use [a] knife to murder or kill or ransack a home.  It does not show state of mind 30 hours earlier and it does not show a plan."

The state filed an Amended Motion for Further Findings of Fact and

14

Rulings of Law, which corrected an error in the state's previous motion with regard to the pertinent dates, to indicate that the incident in question had occurred on the same night as the murder as opposed to 30 hours after the murder.[6] In a third order, the trial court again declined to change its ruling:

> "The court has reviewed its prior ruling to determine if that change would affect its ruling. It would not. The state[']s allegation [is] that defendant[']s conduct is admissible and relevant to show defendant[']s continuing course of conduct. Of course everything that defendant did is a continuing course of conduct. The question is: What if anything is relevant about defendant[']s conduct after the alleged murder that would show defendant[']s plan[?] That is, what about the arrest for kidnapping and DUII * * * shows defendant was involved in a murder where the deceased was stabbed on the back of his arms and bled to death primarily because he had a blood alcohol level of .49 [percent] and would not have died otherwise[?]
>
> "The state argues that the arrest for kidnapping and DUII are not 'prior bad acts' or 'uncharged conduct' but are 'simply information relevant to the defendant[']s actions, CONDUCT, and demeanor during the time surrounding the homicide.'
>
> "I disagree. This court stands by its previous ruling."

(Emphasis in original.)

B.     *State's Arguments on Direct Review*

In this court, the state advances two theories regarding how the evidence of the May 6-7, 1994 incident would be relevant for a nonpropensity purpose. First, the

_____

[6]     The state's Amended Motion was filed before the date of the trial court's second order, but apparently was not entered until after the trial court had issued that order. Thus, it would appear that the trial court did not see the state's Amended Motion until after it had issued its second order, and the state did not see the trial court's second order until after it had filed its Amended Motion.

state argues that "the incident involving Early tends to prove that defendant was in the area of 7th Street in Northeast Portland near the time of the homicide." In support of that "proximity" theory of relevance, the state explains that,"[i]f a factfinder believes that defendant was indeed in the vicinity at the time of the homicide, that fact has a tendency to support the state's theory that defendant committed the crime. It shows that he had an opportunity to commit the homicide, and it corroborates the DNA evidence that ties defendant to the scene." Second, the state argues that "[t]he facts of the Early incident also are necessary to show defendant's flight from the area." In support of that "flight" theory of relevance, the state explains that, "[f]light and evasive measures are relevant to a guilty conscience. A guilty conscience is circumstantial evidence of guilt."

Defendant contends that the state failed to preserve the arguments that it now makes before this court. The state responds that both arguments were adequately raised before the trial court, based largely on the state's single reference during argument at the hearing to "[defendant's] flight from the State of Oregon." The state argues that that single reference to "flight" was sufficient to preserve for this court's review not only the state's argument with regard to flight, but also the state's argument with respect to proximity, because, although the state did not expressly use the term "proximity" in describing its "continuing course of conduct" theory of relevance, the "common-sense meaning of the term 'flight' necessarily involves two aspects: first, that the defendant *began* in one location, and, second, that he *left* that location and went somewhere else." (Emphasis in original.)

As explained below, we conclude that it is unlikely that the trial court

16

understood the state's single, unadorned reference to "flight" in the context of its "continuing course of conduct" argument to encompass all of the layers of meaning and complex relevance arguments the state now presents to this court. Consequently, we hold that that reference was insufficient to preserve either of the theories of relevance that the state now presents to this court.

C. *Preservation*

ORAP 5.45(1) provides that "[n]o matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief." In *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008), we summarized the policies underlying that preservation requirements as follows:

> "Preservation gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal. Preservation also ensures fairness to an opposing party, by permitting the opposing party to respond to a contention and by otherwise not taking the opposing party by surprise. Finally, preservation fosters full development of the record, which aids the trial court in making a decision and the appellate court in reviewing it. Our jurisprudence, thus, has embraced the preservation requirement, '[not] to promote form over substance but to promote an efficient administration of justice and the saving of judicial time.'
>
> "Preservation rules are pragmatic as well as prudential. What is required of a party to adequately present a contention to the trial court can vary depending on the nature of the claim or argument; the touchstone in that regard, ultimately, is procedural fairness to the parties and to the trial court."

(Citations omitted.) The purpose of the preservation doctrine is not "to promote form over substance" but to further those practical policy goals. *Id.* To that end, in analyzing

17

whether a party adequately has preserved an issue for our review, we examine the individual circumstances of the case at hand to determine whether "the policies underlying the rule have been sufficiently served." *State v. Parkins*, 346 Or 333, 341, 211 P3d 262 (2009).

Short-hand references, if they are adequate to serve those policies, may be sufficient to preserve an issue for appellate review. *See, e.g.*, *State v. Walker,* 350 Or 540, 550, 258 P3d 1228 (2011) (noting that "the realities of trial practice may be such that fairly abbreviated short-hand references suffice to put all on notice about the nature of a party's arguments"). However, to adequately preserve an issue for review, a short-hand reference, such as a single word or phrase, must be used in a way and context in which the other parties and the court would understand that the word or phrase refers to a particular legal or factual argument, and also would understand from that single reference the essential contours of the full argument. *See, e.g.*, *State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998) (preservation inquiry is not "a cursory search for some common thread, however remote, between an issue on appeal and a position that was advanced at trial").

Under the circumstances of this case, the state's single reference to "flight" did not adequately put the trial court on notice that the state intended to rely on the theories of "flight" or "proximity" to establish admissibility and did not adequately communicate to the trial court the content and substance of those theories. Although the state quotes heavily from certain isolated excerpts of its argument to the trial court, the state's argument at the hearing consisted primarily of a discussion of the two points that it

18

had raised in its trial court brief -- intent and motive -- both of which were based on the alleged similarity of the "bad acts" to the charged crimes. In the few instances in which the state did mention any alternative theory of relevance, it referred to that theory as relating to defendant's "continuing course of conduct," without explaining to the trial court how the facts underlying that incident established any particular course of conduct or why that course of conduct was relevant to the issue of defendant's guilt.

The state's brief mention of "flight" during its argument to the trial court also was inadequate to fairly apprise defendant of the content and substance of the state's present arguments and to permit defendant meaningfully to respond to those arguments. The state's written brief made no mention of any "flight" or "proximity" argument. Although the state noted in passing before raising its new "continuing course of conduct" theory that the state had "mentioned this to [defense counsel] ahead of time," we do not know how far in advance the state apprised defendant of its alternative position, how exactly it defined that position to defendant, or whether defendant had any meaningful opportunity to prepare to address the issue before the hearing. We do know, however, that defendant did not submit any written argument to the trial court with regard to the state's "continuing course of conduct" argument and that defendant's only mention of that theory at the hearing was to concede that, while the state's alternative theory of relevance might have some merit with regard to whether certain isolated, neutral facts incident to the "bad act" could be established through the testimony of "percipient witnesses," defendant understood the state's position at the hearing to be that the entire incident as a "prior bad act" was relevant and admissible.

19

It is apparent from the trial court's orders that the trial court shared that understanding of the issue. Indeed, the state never asked the trial court to partition out and separately determine the admissibility of any isolated facts incident to the bad acts, but rather defined the evidence that it sought to admit as a "robbery case from May 6, 1994, [in which] the defendant was suspected of entering a man's car while it was stopped at a stop light, threatening the man with violence, and stealing his wallet. Additionally, defendant was suspected of forcing the victim to drive to his home * * * [and] trying to take more money from the victim and then fleeing with the victim when seen by others." That description does not include any of the facts that the state now argues pertain to "flight" and "proximity." The issue that the parties were arguing in the trial court was limited to whether the entire episode -- including the unproved accusations of robbery, carjacking, and kidnapping -- could be admitted at trial, not whether evidence of certain discrete, neutral facts, like when and where the defendant was seen and what he was wearing (and not wearing) on the night of the murder, might be admissible independent of the allegations of criminal activity.

The arguments that the state made in its motion for further findings and rulings also support our conclusion that the state did not raise in the trial court the theories of admissibility that it now presents in this court. As noted, in response to the trial court's first order, which ruled only on the intent and motive theories of admissibility, the state moved for further findings and rulings with regard to its alternative theories of relevance, which it identified only as "state of mind" and "plan." Although a party need not necessarily reiterate an argument at every point in the

proceeding to adequately preserve it, *see, e.g.*, *Walker*, 350 Or at 550, when a party files a motion for the specific purpose of calling the trial court's attention to arguments that it alleges the court to have overlooked and does not mention a particular argument, that provides a strong indication that the party at that time did not consider itself to be making that argument.

Finally, we are cognizant that, in some cases, a strict application of the preservation rule "also can come at a cost. It may prevent a reviewing court from correcting prejudicial error * * * [and] also may inhibit needed development or clarification of the law." *Parkins*, 346 Or at 340. However, we note that, in this case, nothing in the trial court's order, which precluded the admission of the May 6-7, 1994 robbery, kidnapping, and carjacking allegations as "prior bad acts," necessarily bars the state from offering evidence at trial of any individual facts connected with that incident that might be relevant, independent of the inadmissible allegations of bad acts, to establish defendant's proximity to the murder scene and flight therefrom. In declining to review the state's contentions in that regard, we express no opinion on the merits of those arguments but note only that they were not presented to the trial court and the trial court did not rule on them.

### III. ADMISSIBILITY OF DEFENDANT'S POLICE INTERVIEW

The state next seeks this court's review of the trial court's order granting in part and denying in part defendant's motion to exclude his interview with the police. The trial court's order provides:

"Most of this interview was conducted after defendant was advised

21

of Miranda rights and knowingly waived his Miranda rights. The court finds that there are 3 sections of the interview that are relevant and admissible. The parties will have to submit redacted video or transcripts to comply with this order, or agree the interview will be admitted after Miranda with minor deletion (i.e., prison).

> "1. Defendant's admission that he is familiar with the area of 7th and Skidmore because his sister lived in the area at the time of the incident.

> "2. Defendant's admission that he may have dated the deceased.

> "3. Defendant's admission that he had a memory of other events on or about the day of the incident, but generally no memory of that time period."

As we understand the state's argument before this court, the state contends primarily that the trial court erred in excluding evidence of defendant's denials of memory because those statements, if discredited by the factfinder, would be relevant to demonstrate defendant's guilty conscience:

> "The circuit court * * * erroneously concluded that the factfinder should be allowed to consider only the discrete statements in which defendant admits knowledge or memory of particular facts, and that the rest of the interview must be redacted from the evidence that can be admitted at trial. The court's ruling -- which presumes that defendant's self-serving denials must be taken at face value -- denies the factfinder the ability to consider the broader context of those statements, and prevents the factfinder from determining the credibility of the denials themselves."

Without commenting on the validity of that theory of relevance, we note that the state's argument appears to be based on a misinterpretation of the trial court's order. We do not understand that order to mandate that, except for the three sections described, the remainder of the interview must be excluded from evidence. Rather, we note that the trial court's order is set out in wholly affirmative language and provides -- in rejecting defendant's argument that the *entire* interview is *irrelevant* -- that at least three sections

22

of the interview "*are relevant.*" (Emphasis added.) That statement does not, in itself, mandate the conclusion that the remainder of the interview is irrelevant. Instead, in ordering that "[t]he parties will have to submit redacted video or transcripts to comply with this order, *or agree the interview will be admitted after Miranda with minor deletion* (i.e., prison)," (emphasis added), the trial court appears to have reserved judgment on the admissibility of the remainder of the interview, pending the parties' submission of proposed redactions. The state's argument to this court is premature, because the trial court has not yet definitively ordered that *any* part of the interview be excluded. Indeed, the trial court's conception of the likely redactions appears to anticipate certain additional objections, unrelated to relevance, that defendant has not yet made -- specifically, constitutional objections to defendant's pre-*Miranda* statements, and OEC 403 objections to references that defendant had spent time in prison.

Furthermore, to the extent that the state's argument focuses on the relevance of defendant's statements that denied any memory of the time period at issue, we do not understand the trial court's order to conclude that that evidence is irrelevant as an evidentiary matter. The trial court described the third "section" of the interview that it concluded to be relevant as "[d]efendant's admission that he had a memory of other events on or about the day of the incident, *but generally no memory of that time period.*" (Emphasis added.) That part of the order appears to conclude that defendant's statements regarding both his memory *and lack of memory* of that time period are relevant and

23

admissible.[7] Thus, the trial court's order does not appear to exclude any evidence that the state claims should be admitted; rather, it appears that the trial court either has not yet or is not going to exclude that evidence. We decline to rule on a matter that the trial court has not yet decided.

CONCLUSION

In summary, as to the "prior bad acts" evidence, we conclude that the state did not adequately preserve for review the issue whether evidence of the May 6-7, 1994, incident was admissible under OEC 404(3) to prove proximity or flight. As to the challenged evidence derived from defendant's interview with the police, we do not read the trial court's order to require, as the state contends, the exclusion of the evidence that the state seeks to admit. We therefore decline to rule on the state's substantive challenge to that order.

The orders of the circuit court are affirmed, and the case is remanded to the circuit court for further proceedings.

---

[7] We express no opinion on the merits of that determination, as defendant does not challenge it.