LANDAU, S.J.
**779 Petitioner was civilly committed on the ground that he was dangerous to himself, dangerous to others, and unable to provide for his basic needs. At the time of his commitment, he was held in county jail. On appeal, he challenged his commitment on all three grounds. Concerning his ability to provide for his basic needs, petitioner argued that, because he had been in jail at the time of the commitment hearing, it must be presumed that he was receiving adequate care, and the state failed to establish that he would be released from incarceration any time in the near future. The Court of Appeals concluded that petitioner had failed to preserve that argument. State v. K. J. B. , 282 Or. App. 862, 867-69, 387 P.3d 467 (2016). And, because his inability to provide for his basic *293 needs established sufficient grounds to support the commitment order, it declined to address the sufficiency of the evidence as to the other grounds for the order. Id. at 869-70, 387 P.3d 467.
On review, petitioner does not dispute that he did not present to the trial court precisely the same argument that he advances on appeal. He nevertheless contends that he raised the sufficiency of the evidence to support his commitment on the ground that he could not provide for his basic needs and that such a general objection was adequate to preserve the more particular argument he now asserts. The state, meanwhile, argues that the case is now moot because the underlying order of commitment has long since expired. In the alternative, it argues that petitioner did not preserve the argument that, to establish a basic-needs commitment when an individual is currently incarcerated, the state must prove the date when an individual will be released.
We conclude that the case is not moot, given the collateral consequences of an order of civil commitment. We also conclude, however, that petitioner failed to preserve his contention that the state was obliged to establish the expected date of his release from custody to establish the elements of a basic-needs commitment. We therefore affirm the decision of the Court of Appeals.
**780 I. FACTS
The relevant facts are not in dispute. Petitioner has suffered from schizoaffective disorder for more than 30 years and is intermittently homeless. He was arrested in October 2015 for setting a fire near an apartment complex and thereafter held in county jail. While in jail, petitioner blocked the toilet in his cell and urinated on his sleeping mat and clothes. He refused to go to court and demonstrated bizarre and disorganized behavior during a video arraignment on another, unrelated, charge. At that point, the trial judge entered a notice of mental illness, triggering the civil commitment process under ORS 426.070 to ORS 426.415.
At the civil commitment hearing, the state asserted that petitioner should be committed on the grounds that he was dangerous to himself, dangerous to others, and unable to provide for his basic needs. A precommitment investigator who had met with petitioner in jail testified that petitioner exhibited disorganized speech and appeared to be quite paranoid. She stated that, although she did not believe him to be a danger to himself or others, she did believe him unable to meet his basic needs "because of the level of psychosis that I was seeing within the jail setting" and because of the fire incident. She reported that petitioner had explained that he had set the fire in order to keep warm. She also reported he refused medication for his mental disorder. On cross-examination, the investigator testified that she was not aware of any report that petitioner had not been eating or drinking while in jail.
Petitioner's case manager and therapist also testified. She stated that, over the previous year, petitioner had experienced trouble finding a place to live and finding access to food. She said that problems with medications "ha[d] been an ongoing thing" and that, when he does not take his medications, he becomes highly disorganized and delusional. She said that her understanding from jail staff was that he was continuing to refuse medication and that, when released from jail, he has a difficult time obtaining necessary resources. On cross-examination, she said that she had no reason to think that petitioner was not eating or drinking while in jail, but she noted that she had observed **781 that petitioner had lost about ten pounds while in jail. When asked about his resources outside of jail, she reported that she was aware of the existence of family members, but that petitioner was hesitant to rely on them for assistance.
A criminal justice behavioral health specialist testified as well. She stated that, although petitioner had not given jail staff much trouble, "he's not taking very good care of himself in the fact that he's urinating all over everything, and his mat and his clothes and-and he just is very incoherent, [and] disorganized." She said that petitioner had refused psychiatric care while incarcerated. On cross-examination, she said that she had reports that petitioner had occasionally *294 refused to eat while in jail, but that he was generally eating enough to remain healthy.
Finally, petitioner's probation officer testified concerning the circumstances leading to his most recent arrest. On cross-examination, she testified that, during the previous six months, she had no reason to believe that petitioner was not taking care of himself, not feeding himself, or not drinking water.
At the close of the evidence, counsel for petitioner argued that the state had not met its burden of establishing any of the grounds for an involuntary civil commitment:
"[T]his is one of those very difficult cases where I-I do think that the state has met its burden to show that [petitioner] suffers from a mental illness, *** but I don't believe that they have sufficient evidence to allow the court to find by clear and convincing evidence that he is unable to provide for his basic needs, or that he poses a risk to himself or to other people.
"* * * * *
"Basic needs, of course, refers to accessing food, accessing water, accessing necessary medical care to prevent imminent physical-well, a serious harm to the individual. And I don't think that the State has shown that today. All of the witnesses today have testified that-that [petitioner] has experience as a homeless individual, that he has struggled in getting into shelters, that he has struggled maintaining his housing for sure, but at the same time he's been resourceful. He has located food, he has located water, he **782 has not refused food, not refused water. And he has shown himself capable of locating sufficient shelter when needed.
"As far as medical care, there's been a lot of talk about an amputated toe from July, but there's been no evidence that that continues to-to be an ongoing medical concern that he is ignoring. ***
"So, your honor, I just don't think we have enough here for the court to conclude that [petitioner] is unable to meet his basic needs."
The trial court concluded that the state had met its burden of establishing the requirements for commitment on all three grounds-dangerous to himself, dangerous to others, and unable to provide for his basic needs. As to the basic-needs showing, the court explained:
"[I]f [petitioner] were released right now he would find himself in a life threatening condition because, although he's experienced as a homeless person, right now he doesn't known what month it is *** and has dropped some weight and is refusing to take medications, is clearly delusional, not able to do what it takes to get into the shelters, even though he knows where they are. And, under these circumstances, what I've heard, *** I do find that the high threshold is *** met as far as his inability to *** meet his basic needs. *** I was particularly troubled by [the jail liaison's] description of the occurrences in the jail with the plugging of the *** toilets and walking through the sewage and with a toe that may or may not need continued medical attention. And covering your personal belongings in urine ***-I mean, all that to me seems like he's dangerous to himself and his own welfare by doing that to his living situation."
The court committed petitioner to the Oregon Health Authority for a period not to exceed 180 days.
Petitioner appealed the order of commitment to the Court of Appeals, asserting that the record was insufficient to support commitment on any of the three grounds. Concerning the basic-needs ground, petitioner argued that, because he was in jail at the time of the commitment hearing, it must be presumed that he was receiving care adequate to meet his basic needs. To establish a basic-needs commitment under those circumstances, he argued, the **783 state must prove that his release from incarceration was "impending." In this case, he argued, "the record does not support a basic-needs commitment as the record lacks any evidence as to when [petitioner] would be released from his criminal incarceration." For support, petitioner relies on the Court of Appeals decision in State v. Jensen , 141 Or. App. 391, 917 P.2d 541 (1996). In that case, the court reversed an order of commitment based on the petitioner's inability to meet his basic needs. The *295 court noted that the petitioner was in custody at the time of the commitment hearing; that local correctional facilities are statutorily required to provide adequate care for those in custody; and the state had not established that his release was impending and that, on release, he would be incapable of providing for his basic needs. Id . at 394-95, 917 P.2d 541.
As we have noted, the Court of Appeals in this case concluded that petitioner failed to preserve that argument drawn from Jensen, and it affirmed petitioner's commitment on the basis that he was incapable of meeting his own basic needs. Petitioner sought this court's review. After we allowed review, the state moved to dismiss the appeal as moot, given that the 180-day commitment period had long ago expired. We reserved that issue until the appeal had been fully briefed and argued.
II. ANALYSIS
We begin with an overview of the law governing civil commitment for persons with mental health and developmental disabilities. Under ORS 426.070(2)(c), civil commitment proceedings may be initiated through a notice of mental illness stating that the person sought to be committed "is a person with mental illness and is in need of treatment, care, or custody." See State v. O'Neill , 274 Or. 59, 62, 545 P.2d 97 (1976) (describing commitment process under earlier version of the statute). A precommitment investigator carries out an investigation to assist in determining whether commitment is appropriate. ORS 426.074(2) ; O'Neill , 274 Or. at 62-63, 545 P.2d 97. A judge issues a citation containing a hearing date and other information to the alleged mentally ill person. ORS 426.090. The precommitment investigator's report must be provided to the allegedly mental ill person **784 and counsel at least 24 hours before the civil commitment hearing. ORS 426.074(3) ; see In re Maxwell , 164 Or. App. 171, 172, 988 P.2d 939 (1999), rev. den. , 330 Or. 71, 994 P.2d 133 (2000) (holding that providing the report at least 24 hours before hearing "is essentially a question of providing adequate and timely discovery"). The civil commitment hearing must be held within five working days of the initial citation under ORS 426.090. ORS 426.095(2)(a) ; State v. W. B. R. , 282 Or. App. 727, 728-29, 387 P.3d 482, 483 (2016) (reversing civil commitment because hearing occurred on sixth working day); State v. B. L. H. , 287 Or. App. 885, 886, 403 P.3d 538 (2017) (reversing commitment because hearing was held on seventh working day).
At the civil commitment hearing, both the allegedly mental ill person and the state may call and cross-examine witnesses, including the precommitment investigator. ORS 426.095(3). The court appoints at least one qualified examiner, who examines the allegedly mentally ill person at the hearing and prepares a report. ORS 426.120. After all of the evidence is presented, the court may order the involuntary commitment of a person if it finds, by clear and convincing evidence, that the person has a mental disorder that causes the person to be dangerous to himself or herself, dangerous to others, or unable to provide for basic personal needs and not receiving necessary care. ORS 426.005(1)(e) (2013) ; ORS 426.130(1)(a)(C) (2013) ; see O'Neill , 274 Or. at 67, 545 P.2d 97.
With that framework in mind, we turn to petitioner's case, which raises essentially three potential issues: First, whether the appeal must be dismissed on the ground that it has become moot; second, whether, if not moot, we must affirm on the ground that petitioner failed to preserve the contention that he now advances; and, third, whether, if preserved, petitioner is correct that the state failed to establish the statutory prerequisites for commitment.
A. Mootness
The state moved to dismiss petitioner's appeal as moot because the 180-day period of civil commitment set out in the trial court's order has expired. Petitioner responds that the case is not moot, because there remain collateral **785 consequences of the order of commitment even after the expiration of the order.
This court has long concluded that it will not decide cases that have become moot. See generally *296 Couey v. Atkins , 357 Or. 460, 510-15, 355 P.3d 866 (2015) (reviewing cases). Earlier cases have expressed the rule against deciding moot cases as a matter of constitutional imperative, while more recent cases treat it as a prudential consideration. Id. at 515-20, 355 P.3d 866. But either way, the case law has consistently defined what is and is not a "moot" case.
Generally speaking, a case becomes moot when a court's decision "will no longer have a practical effect on the rights of the parties." Brownstone Homes Condo. Ass'n v. Brownstone Forest Heights, LLC , 358 Or. 26, 30, 361 P.3d 1 (2015) ; Dept. of Human Services v. G. D. W. , 353 Or. 25, 32, 292 P.3d 548 (2012). Thus, for example, when a party challenges an order certifying an initiative measure to the ballot for the next election, the challenge becomes moot once the election has passed; an order from a court concerning the lawfulness of the certification order can have no practical effect, because the election has passed. See generally Unger v. Rosenblum , 362 Or. 210, 223-25, 407 P.3d 817 (2017) (reviewing cases).
In some cases, however, even when a challenged order has expired, it may have collateral consequences to the party challenging its lawfulness. And, in such cases, a challenge to the lawfulness of that order is not moot.
The burden rests with the party moving for dismissal to establish that a case is moot. On that point, this court's decision in Brumnett v. PSRB , 315 Or. 402, 407, 848 P.2d 1194 (1993), is directly on point. In that case, the petitioner was found guilty, but for a mental disease or defect, of burglary and theft, and he was committed to the jurisdiction of the Psychiatric Security Review Board. Later, he sought release from PSRB jurisdiction on the ground that he no longer suffered a mental disease or defect. PSRB refused to release him, and he sought judicial review. While review was pending, however, PSRB decided to release him unconditionally. It then moved to dismiss the review proceeding on **786 the ground that it had become moot. The petitioner argued that, even though he had been released, a judicial determination of the lawfulness of the commitment order to the jurisdiction of PSRB remained a live controversy because, under ORS 179.620, he was liable to the state for the costs of his care. The state replied that there was no evidence that it had taken any steps to require the petitioner to pay for his costs of care. This court concluded that, given the lack of any evidence that the state was seeking to recover from the petitioner, "[t]he moving party has carried its burden to establish that the case is moot." Id. at 407, 848 P.2d 1194.
The moving party's burden includes the burden of establishing that any collateral consequences either do not exist or are legally insufficient. Dept. of Human Services v. A. B. , 362 Or. 412, 426, 412 P.3d 1169 (2018). That does not mean that the moving party is required to imagine all possible collateral consequences and then disprove each of them. Rather, when the moving party takes the position that a case has become moot, the responding party must identify any collateral consequences that he or she contends has the effect of producing the required practical effects of a judicial decision. At that point, the moving party must demonstrate that any of those identified collateral consequences either does not exist or is legally insufficient. Id.
In this case, the state's motion to dismiss is predicated on the fact that the 180-day civil commitment period has terminated and that petitioner is no longer committed pursuant to the challenged order. Petitioner responds that the appeal remains justiciable because of two collateral consequences. First, he contends that, under ORS 179.620, he remains liable to the state for the costs of his care during commitment. Second, he contends that an order of civil commitment carries with it a continuing social stigma that has long been recognized in this state's case law.
The state rejoins that petitioner's first argument is defeated by Brumnett , which held that, in the absence of evidence that the state was taking active steps to collect from the petitioner, his liability for the costs of care does not amount to a collateral consequence sufficient to defeat a mootness claim. As to *297 the second argument, the state **787 argues that petitioner relies on "purely speculative notions of social stigma." According to the state, societal attitudes about mental health generally have changed, largely eliminating any stigma that once may have been associated with involuntary commitment.
The state is correct that, as to the first argument, Brumnett controls. There is some question whether Brumnett was correctly decided. The court in that case concluded that, even though the petitioner was correct in asserting that he remained liable to the state for the costs of his care while committed to the jurisdiction of the PSRB, the state nevertheless met its burden of persuasion by an absence of evidence that it had taken any steps to require the petitioner actually to pay. 315 Or. at 407, 848 P.2d 1194. It certainly could be argued that the state could not defeat the petitioner's existing statutory liability with an absence of evidence of an intention to collect (which is different from affirmative evidence that the state did not intend to collect). But we need not address that question, because petitioner's second argument, concerning the social stigma associated with involuntary mental commitment, is dispositive.
This court has not had occasion to address whether a social stigma attaches to an order of involuntary of civil commitment. The Court of Appeals has, however. In State v. Van Tassel , 5 Or. App. 376, 484 P.2d 1117 (1971), the appellant's civil commitment period had expired. The state alleged that the case was moot as a result. The Court of Appeals analogized the stigmatic effects of civil commitment to that of criminal and contempt cases, and it held that involuntary civil commitment creates a social stigma such that the expiration of a commitment period does not moot an appeal:
"In both types of cases and in the case at bar, the subject was involuntarily committed to the custody of the state. In both, a social stigma attaches which affects the person's reputation and earning potential. Although ORS 426.160 does put limits on the availability of the judicial record of commitment, it is no secret that defendant was committed ***. Furthermore, inquiry into a person's history of mental health by, for example, a prospective employer or bonding agency, would be legitimate. *** In fact, if he refused to give a prospective employer or surety such information, he **788 could very well be turned down for that reason. Finally, the fact that defendant had been involuntarily committed as a mentally ill person would not be a secret, irrespective of other material contained in the court record.
"Whether a society should view mental illness as carrying with it more stigma than any other form of illness, it, in fact, does. A legal commitment for mental illness may have deleterious collateral effects in addition to stigma."
Id. at 385, 484 P.2d 1117.
The Court of Appeals extended that holding in State v. E. A. L. , 179 Or. App. 553, 556, 41 P.3d 440, 442 (2002), in which the state alleged that the appellant's recommitment for a further period had rendered his challenge to the original civil commitment order moot. Concluding that the case was not moot, the court held that recommitment increased the stigmatic consequence:
"Although continuation of commitment obviously differs from an initial commitment in certain respects, the stigma that arises from commitment is a function not only of the fact of commitment but, also, of its duration. Bluntly, the longer someone is committed for a mental illness-six months versus one year; one year versus three years-the greater the attendant stigma."
Id. Thus, the Court of Appeals has repeatedly held that in a civil commitment proceeding, stigma alone is sufficient to prevent the appeal from being mooted by the fact of an individual's release or re-commitment.
The Court of Appeals' conclusions regarding the social stigma associated with mental commitment are not without support in the social science literature,[1] although **789 the conclusions *298 of researchers is not entirely uniform.[2] But we need not weigh in on that dispute. It suffices to say for the purposes of this case that the state simply has not met its burden. As we have noted, the burden rests with the state to establish that any collateral consequences that petitioner has identified either do not exist or are legally insufficient. In this case, the state has done neither. It has simply asserted-without support of any kind-that the social stigma of which petitioner complains does not exist. That is not adequate to establish that there are no collateral consequences of the order of civil commitment. Accordingly, the state's motion to dismiss is denied.
B. Preservation
Petitioner argues that the trial court's order of commitment on the ground that he is unable to meet his basic needs fails as a matter of law because, at the time of the hearing, he was incarcerated and, under the Court of Appeals' decision in Jensen , a court "must presume" that he is receiving adequate care while in jail. According to petitioner, evidence of his ability to care for his needs outside of jail is pertinent only if the state establishes that his release from custody is imminent. In this case, he contends, the state offered no such proof of a release date. The state responds that petitioner failed to preserve that argument, and the Court of Appeals agreed. On review, petitioner argues that, **790 although he did not make the precise argument that he now advances, his more general contention that the evidence was insufficient to establish a basic-needs commitment was adequate to preserve the argument.
Generally speaking, to raise an issue before the Court of Appeals or Supreme Court, a party must have preserved it by raising the issue in the original proceeding. ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief."). The purposes of the rule requiring preservation of error are "to allow the trial court to consider a contention and correct any error, to allow the opposing party an opportunity to respond to a contention, and to foster a full development of the record." State v. Clemente-Perez , 357 Or. 745, 752, 359 P.3d 232 (2015) ; see also State v. Vanornum , 354 Or. 614, 632, 317 P.3d 889 (2013) (Preservation rule "ensure[s] that trial courts have an opportunity to understand and correct their own possible errors and that the parties are not taken by surprise, misled, or denied opportunities to meet an argument.")
Precisely what is required to serve those purposes may vary with the individual circumstances of each case. See, e.g. , State v. Haynes , 352 Or. 321, 335, 284 P.3d 473 (2012) ("we examine the individual circumstances of *299 the case at hand" (quoting State v. Parkins , 346 Or. 333, 341, 211 P.3d 262 (2009) )). In some circumstances, a fairly abbreviated short-hand reference may suffice to put the trial court and the parties on notice of the nature of the argument. See, e.g ., State v. Walker , 350 Or. 540, 550, 258 P.3d 1228 (2011) (so noting). But such short-hand references "must be used in a way and context [that] the other parties and the court would understand * * * from that single reference the essential contours of the full argument." Haynes , 352 Or. at 334-35, 284 P.3d 473 ; see also State v. Wyatt , 331 Or. 335, 343, 15 P.3d 22 (2000) (At the least, a party is required to "provide the trial court with an explanation of his or her objection that is specific enough to ensure that the trial court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately."). **791 As a rule, an objection as to the legal insufficiency of evidence to prove a claim on one theory does not have the effect of preserving all other possible theories of insufficiency; rather, parties must explain to the court and opposing party a specific reason for the asserted legal insufficiency. In State v. Serrano , 355 Or. 172, 324 P.3d 1274 (2014), cert. den. , --- U.S. ----, 135 S.Ct. 2861, 192 L.Ed.2d 899 (2015), for example, the defendant was charged with aggravated felony murder. The state's theory was that the victims had been killed when the defendant had unlawfully entered into their home to commit a burglary. At trial, the defendant moved for a judgment of dismissal, arguing the evidence was legally insufficient because of the state's failure to prove that he had personally committed the murders. On appeal, he argued that the evidence was legally insufficient because the state had failed to prove an adequate causal connection between the burglary and the homicides. This court declined to address that argument. The court explained that the "defendant's argument on review has a fundamentally different focus from his argument at trial. Because the trial court was never presented with the argument for acquittal that [the] defendant advances on review," the claim of error was not preserved. Id . at 178, 324 P.3d 1274 ; see also State ex rel. Juv. Dept. v. S. P. , 346 Or. 592, 602-04, 215 P.3d 847 (2009) (objection to admissibility of hearsay under OEC 803(18a)(b) not sufficient to preserve objection on constitutional grounds).
Similarly, a general objection to a trial court ruling is not sufficient to preserve all possible theories for such an objection. On point in that regard is Peeples v. Lampert , 345 Or. 209, 191 P.3d 637 (2008). In that case, the state asked the trial court to dismiss a post-conviction proceeding as a sanction for the petitioner's failure to participate in a scheduled deposition. The petitioner generally objected to the sanction of dismissal. The trial court granted the state's request. On appeal, the petitioner argued that the trial court erred in granting the dismissal request because the trial court had failed to make findings about whether a less drastic sanction would have been more appropriate. This court refused to entertain that contention. Although it was true that the trial court had failed to make findings, the "[p]etitioner did nothing to call that omission to the post-conviction court's **792 attention," thus depriving the post-conviction court of the opportunity to recognize its error and quickly correct it. Id . at 223-24, 191 P.3d 637.
In this case, petitioner's counsel generally argued that the state failed to produce "sufficient evidence that he is unable to provide for his basic needs." He argued that the evidence showed that, although petitioner "has experience as a homeless individual, that he has struggled maintaining his housing, for sure," he nevertheless has shown that "he's been resourceful. He has located food, he has located water, he has not refused food, nor refused water. And he as shown himself capable of locating sufficient shelter when needed."
On review, he now asserts that, based on the Court of Appeals decision in Jensen , the court was required to presume that his needs were being met in custody and that he could not be committed on basic-needs grounds in the absence of proof from the state as to a specific date of release from custody.
Petitioner did not make that argument in the trial court. He did not mention Jensen .
*300 He did not suggest that the state was obligated to establish a date of release. Nor did he argue that, in the absence of such proof, the court was obligated to presume that his basic needs were being met in custody. To the contrary, as we have noted, he cross-examined witnesses about whether he was-irrespective of any presumption-actually able to meet his needs while in jail. Under petitioner's reading of Jensen , such cross-examination would have been irrelevant, given that, while in custody, the court was required as a matter of law to presume his needs were being met. Moreover, in closing, counsel for petitioner focused on evidence that he could meet his needs when not in jail. Again, under petitioner's reading of Jensen , in the absence of any evidence of when he was to be released, the argument was beside the point.
Petitioner does not explain, and we do not understand, how under those circumstances the trial court and the state were fairly apprised of the fact that petitioner was actually relying on Jensen . We cannot say that petitioner's general arguments about the sufficiency of the evidence **793 gave the trial court the opportunity to avoid the error that he now asserts.
We therefore decline to address petitioner's argument on review. Because we affirm the commitment on the basis of appellant's inability to meet his basic needs, we need not reach the question whether the evidence was sufficient to support a commitment on any other basis.
The decision of the Court of Appeals is affirmed. The order of commitment of the circuit court is affirmed.

See, e.g. , Angela M. Parcesepe & Leopoldo J. Cabassa, Public Stigma of Mental Illness in the United States: A Systematic Literature Review , 40 Admin & Policy in Ment Health 384, 395 (2013) ("Stigmatizing beliefs about the dangerousness of people with mental illness have increased over time. Beliefs of shame, blame, incompetency, punishment, and criminality of people with mental illness are common"); Mark L. Hatzenbuehler et al. , Stigma as a Fundamental Cause of Population Health Inequalities , 103 Am J Public Health 813 (2013); Bernice A. Pescosolido et al. , The "Backbone" of Stigma: Identifying the Global Core of Public Prejudice Associated With Mental Illness , 103 Am. J. Public Health 853 (2013); Peggy A. Thoits, Resisting the Stigma of Mental Illness , 74 Social Psych. Q. 6, 24 (2011) ("[D]erogation and discrimination are both expected and experienced by the vast majority of patients/consumers with a [mental] disorder and that stigma creates serious and persistent problems in their work and social lives."); Irene Covarrubias & Meekyung Han, Mental Health Stigma about Serious Mental Illness among MSW Students: Social Contact and Attitude , 56 Social Work 317, 317 (2011) ("[S]tigmatizing or negative attitudes against those living with mental illnesses are prevalent among the general U.S. population"); Angela K. Thachuk, Stigma and the Politics of Biomedical Models of Mental Illness ," 4 Intl. J. of Feminist Approaches to Bioethics 140, 141 (2011) (describing the "well documented" stigma surrounding mental illness that creates barriers to housing, employment, interpersonal relationships, and access to adequate healthcare).

Some researchers have argued that social changes that have taken place in this country over the last half-century-public education efforts, the community mental health movement, increases in levels of education, and increased tolerance-have led to a decline in the social stigma associated with mental illness, while others contend that, if anything, the social stigma has worsened. See generally J. C. Phelan & B. G. Link, The Growing Belief that People with Mental Illness Are Violent: The Role of the Dangerousness Criterion for Civil Commitment , 33 Soc. Psychiatry & Psychiatric Epidemiology 33 Suppl. 1 S7-12 (1999) (reviewing literature).