No. 10 February 5, 2026 821

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Adverse Party,*

*v.*

ALLEN REX ROBERTS,
*Defendant-Relator.*

(CC 21CR38424) (SC S071661)

Original proceeding in mandamus.*

Argued and submitted April 17, 2025.

Nadia H. Dahab, Sugerman Dahab, Portland, argued the cause and filed the briefs for defendant-relator.

Kirsten M. Naito, Assistant Attorney General, Salem, argued the cause and filed the briefs for plaintiff-adverse party. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Amy E. Potter, Angeli & Calfo LLC, Portland, filed the brief for *amicus curiae* Oregon Public Defense Commission. Also on the brief was Joanna T. Perini-Abbott.

Jessica Snyder, Julie Vandiver, Assistant Federal Public Defenders, and Stephen R. Sady, Chief Deputy Federal Public Defender, District of Oregon, Portland, filed the brief for *amicus curiae* Oregon Federal Public Defender.

Lindsey Burrows, O'Connor Weber LLC; Garner Kropp, Fenwick & West LLP, San Francisco, California; and Kelly Simon, American Civil Liberties Union of Oregon, filed the brief for *amici curiae* Criminal Law & Justice Center and American Civil Liberties Union of Oregon. Also on the brief were Todd Gregorian and Kathryn Hauh, Fenwick & West LLP.

---

\* On petition for writ of mandamus from an order of Multnomah County Circuit Court, Benjamin Souede, Judge.

Before Duncan, Garrett, DeHoog, Bushong, James, and Masih, Justices, and Pagán, Judge, Justice pro tempore.[**]

DUNCAN, J.

The alternative writ of mandamus is dismissed as moot.

_____

[**] Flynn, C. J., did not participate in the consideration or decision of this case.

**DUNCAN, J.**

This case is before this court on a petition for a writ of mandamus filed by relator, Allen Rex Roberts. It arises out of a criminal case the state brought against him.

In the criminal case, relator was arraigned on a grand jury indictment. He requested, and was eligible for, appointed counsel, but no lawyer was available to represent him. After being without counsel for months, relator filed a motion to dismiss the criminal case, asserting, among other things, that the state had violated his right to counsel under Article I, section 11, of the Oregon Constitution. That provision requires that, "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." The trial court denied the motion.

Relator then filed a petition for mandamus relief in this court, and we issued an alternative writ directing the trial court to either vacate its order denying relator's motion or show cause for not doing so. The trial court did not vacate its order, and this mandamus case proceeded to briefing. In his brief, relator raises three legal issues: (1) whether the state's failure to appoint counsel violated his right to counsel under Article I, section 11; (2) if it did, whether dismissal of the criminal case without prejudice was an appropriate remedy; and (3) if it was, whether relator was entitled to dismissal of the criminal case without prejudice because he had been unrepresented for a certain period of time.[1]

While the parties briefed this mandamus case, relator's criminal case remained pending in the trial court and relator remained unrepresented. Then, almost a year after relator's arraignment, the trial court dismissed the criminal case because of the unavailability of counsel. This court asked the parties to submit supplemental briefing regarding

---

[1] Trial courts and the Oregon Public Defense Commission (OPDC), which is part of the executive branch, have roles in the appointment of counsel. *See* ORS 135.045(1)(b) ("If the defendant does wish to be represented by counsel, the court, in accordance with ORS 135.050, shall appoint counsel to represent the defendant."); ORS 151.216(1)(h)(B) (providing that one of OPDC's duties is the adoption of "policies, procedures, standards and guidelines regarding[,]" among other things, "[t]he appointment of counsel"). Thus, throughout this opinion and for ease of reference, we refer generically to the obligation of the "state" to appoint counsel to represent eligible criminal defendants.

whether the dismissal of the criminal case rendered this mandamus case moot and, if so, whether this court should exercise its discretion to decide the case under ORS 14.175, which provides that courts may decide certain moot cases that present legal issues that are "capable of repetition" and "likely to evade judicial review."

For the reasons explained below, we conclude that this mandamus case is moot, but that we should exercise our discretion under ORS 14.175 to decide it. We also conclude that this is the type of case in which mandamus relief is possible because relator does not have a "plain, speedy, and adequate remedy in the ordinary course of law." *See* ORS 34.110 (stating that a writ of mandamus shall not be issued in any case where the relator has such a remedy).

On the merits, we answer the three questions raised by relator's petition, as follows:

(1) The state violated relator's Article I, section 11, right to counsel. The right to counsel is fundamental to our criminal justice system. It helps ensure that criminal prosecutions are conducted fairly and in accordance with the law by guaranteeing that a defendant has access to a legal advocate to respond to the state's exercise of its prosecutorial powers. When the state fails to appoint counsel, a defendant's legal interests are at risk of prejudice because the defendant is without anyone to advise them, address pretrial restrictions on their liberty, assert their rights, and prepare their defense. In short, the defendant is subjected to the state's prosecutorial powers and all the accompanying consequences but left without the means to effectively respond. Allowing such a situation to persist for an extended period, as in relator's case, violates Article I, section 11.

(2) Dismissal without prejudice—which ordinarily allows the state to refile the charges later—can be an appropriate remedy for the state's failure to appoint counsel in violation of Article I, section 11. A failure to appoint counsel results in several pretrial harms that are independent of the ultimate resolution of the criminal prosecution. First, the defendant is subject to restraints on their liberty but lacks counsel to challenge or modify them. Second, the defendant

is deprived of the means necessary to move their case forward. The defendant is without a legal advocate to review the state's charges and evidence, gather and preserve defense evidence, and take steps to advance their case toward resolution, whether through dismissal, plea, or trial. Meanwhile, the state has counsel to protect its interests and prepare its case. Third, the failure to appoint counsel can have a coercive effect. An extended delay in the appointment of counsel can cause a defendant to abandon their right to counsel. As the burdens of having an open case without counsel grow, so does the likelihood that a defendant will waive their right to counsel just to be able to move their case forward. That undermines the purpose of the right to counsel, which, as mentioned, is to help ensure that criminal prosecutions are conducted fairly and in accordance with the law.

Dismissal without prejudice can mitigate those pretrial harms. It relieves the defendant from being subject to liberty restrictions and criminal charges while being unable to respond. It also reduces the pressure on a defendant to waive their right to counsel and proceed without representation. At the same time, it allows the state to refile the charges later, when the defendant has access to counsel as the constitution requires.

(3) Relator was entitled to dismissal of the criminal case without prejudice. We conclude that, as a general rule, dismissal without prejudice is required when, at any point post-arraignment, the state has failed to provide counsel to an eligible defendant for a period of more than 60 consecutive days in a misdemeanor case or more than 90 consecutive days in a felony case. There must be a limit to the amount of time that the state can maintain a criminal prosecution without appointing counsel for an eligible defendant. We acknowledge that setting such a limit involves a judgment call. Oregon's current public defense crisis requires us to make that call and establish a general rule that can be applied consistently across the state. We base the general rule on the pretrial harms identified above: that the defendant is subject to restraints on their liberty but lacks counsel to challenge or modify those restraints, that the defendant cannot move their case forward, and that an extended delay

in the appointment of counsel puts pressure on a defendant to waive their right to counsel. We also base it on laws, practices, and standards relating to criminal cases, which support a conclusion that leaving a defendant without counsel for longer periods is unreasonable in light of the time within which many cases can be, and are expected to be, completely resolved. Finally, because in setting the limit we are determining the appropriateness of a particular remedy, we base the rule on our best assessment of the relationship between the violation and the requested relief. Applying the general rule, we conclude that relator, who was unrepresented for more than 90 days while appearing for court as required, was entitled to dismissal of his criminal case without prejudice.[2]

## I.   BACKGROUND

### A.   *Oregon's Public Defense Crisis*

Before turning to the facts of this case, we begin by briefly describing the context in which they arise. For several years, Oregon has experienced a systemic, statewide public defense crisis that has resulted in thousands of pretrial, out-of-custody defendants lacking counsel to assist them.[3]

---

[2] Relator also contends that the failure to appoint counsel violated the Sixth Amendment to the United States Constitution, which provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." Because we conclude that, under the circumstances of this case, the failure to appoint counsel to represent relator violated Article I, section 11, of the Oregon Constitution, and because relator does not contend that he is entitled to additional or greater relief under the Sixth Amendment, we need not, and do not, address his arguments under the federal constitution. *See State v. Gray*, 370 Or 116, 128, 515 P3d 348 (2022) (so reasoning).

[3] In May 2024, the Ninth Circuit Court of Appeals upheld a federal district court injunction, requiring, in general terms, that *in-custody* defendants who had not been appointed counsel within seven days had to be released from custody subject to reasonable conditions imposed by state trial courts. *Betschart v. Oregon*, 103 F4th 607, 613 (9th Cir 2024); *see also Betschart v. Garrett*, 700 F Supp 3d 965 (D Or 2023) (describing injunction); *Betschart v. Garrett*, No CV-01097-CL (D Or Nov 14, 2023) (amending injunction and describing exceptions, including that the order did not apply to defendants who were charged with murder or aggravated murder, who fired their attorneys, who failed to execute a release agreement, or who were released under the order but had their releases revoked).

As noted, relator was not subject to that federal injunction because he was not in custody, having been released pending trial subject to restrictive conditions. As of February 2, 2026, there were over 2000 out-of-custody defendants without counsel. *See* Oregon Judicial Department, *Oregon Circuit Courts Unrepresented Individuals Summary*, https://app.powerbigov.us/view?r=eyJrIjoiNDQ2NmMw YWMtN-zhiZi00MWJhLWE3MjgtMjg2ZTRhNmNmMjdmIiwidCI6IjYxMzN

According to *amicus curiae* the Oregon Public Defense Commission (OPDC), the state agency responsible for establishing and maintaining Oregon's public defense system, there are "simply not enough defense attorneys in the state to represent every indigent defendant." Although "OPDC's goal is to provide counsel promptly for all indigent defendants," meeting that goal "for every defendant has not been achievable in recent years" for a variety of reasons. The agency acknowledges that, "at least in the near term," it will be unable promptly to appoint counsel for all indigent defendants and that "many may be without counsel for weeks if not months." Both parties acknowledge that the legislative and executive branches of our state government are working on systemic reforms to address the immediate effects of this crisis and establish policies to ameliorate it.

Our role in this case is not to suggest which policies those branches should adopt. *Cf. Bellshaw v. Farmers Ins. Co.*, 373 Or 307, 328, 567 P3d 434 (2025) ("[A] court cannot faithfully carry out [legislative] intent by choosing for itself how best to accomplish legislative goals, ignoring the means by which the legislature has chosen to do so."). Instead, our role here is quite limited. We must determine whether the failure to appoint counsel to represent an eligible defendant post-arraignment for an extended period of time violates the state constitutional right to counsel and, if so, whether a trial court is required to grant a defendant's motion to dismiss the criminal case against them after the passage of a certain period of time. *See State v. Rodriguez/Buck*, 347 Or 46, 79, 217 P3d 659 (2009) ("[T]he Oregon Constitution represents the fundamental expression of the people regarding the limits on governmental power. And it is the obligation of the courts to ensure that those fundamental principles are followed."); *State ex rel. Ricco v. Biggs*, 198 Or 413, 430, 255 P2d 1055 (1953), *overruled in part on other grounds by State ex rel Maizels v. Juba*, 254 Or 323, 327, 460 P2d 850 (1969) ("The constitutional rights of an individual are fundamental and inalienable rights. * * * The duty of seeing that they are protected and preserved inviolate falls squarely upon the shoulders of the judiciary.").

lYzg5LWU1MWItNGExYy04YjY4LTE1ZTg2ZGU3MWY4ZiJ9 (last accessed February 2, 2026).

B.   *Facts*

With that understanding of the current crisis and this court's role, we turn to the facts of this case, which are procedural and undisputed. In 2021, relator was charged by indictment with two crimes—specifically, unauthorized use of a vehicle, ORS 164.135(1), and possession of a stolen vehicle, ORS 819.300—both of which were alleged to have been committed on August 9, 2021. Those charges were ultimately dismissed without prejudice in October 2022 because the state was unable to appoint counsel for relator.

Then, in April 2024—about a year and a half after the dismissal of the previous indictment—relator was re-indicted on the same two charges that had been dismissed. Relator was arraigned on the new indictment and released on conditions, including that he "[a]ppear at all times and places ordered by the Court until discharge or final order of the Court" and "not leave the State of Oregon without permission of the court."[4] The trial court determined that relator had requested and was eligible for appointed counsel and appointed "OPDC"—not a named attorney—to represent relator. Over the next few months, several hearings were held for the purpose of appointing counsel, but no attorney was available.

In December 2024, a volunteer lawyer filed a notice of limited representation in the trial court, stating that she represented relator only in connection with a motion to dismiss for lack of counsel. In that motion, relator argued,

_____

[4] Relator's release agreement required that he comply with the general release conditions in ORS 135.250(1), which provides:

"If a defendant is released before judgment, the conditions of the release agreement shall be that the defendant will:

"(a) Appear to answer the charge in the court having jurisdiction on a day certain and thereafter as ordered by the court until the defendant is discharged or the judgment is entered;

"(b) Submit to the orders and process of the court;

"(c) Not depart this state without leave of the court; and

"(d) Comply with such other conditions as the court may impose."

The agreement also imposed two other conditions: (1) that relator "[k]eep in contact with [his] attorney once one is appointed or retained" and notify the attorney of any updates to his phone number and mailing and residential addresses; and (2) that relator comply with "Pretrial Monitoring and report to Pretrial Release Services immediately after [his] next court hearing." (Boldface omitted.)

among other things, that the state's failure to appoint an attorney to represent him violated his right to counsel under the state and federal constitutions. On January 2, 2025, the trial court denied the motion to dismiss, noting that relator had been "represented at the critical stages" that the case had reached to that point and that the case was in "suspended animation" due to "a failure of the system" that prevented the case from proceeding to "the next critical stage."

Relator timely sought mandamus relief in this court. By that point, relator had been without named counsel on the current indictment for about nine months. On January 29, we issued an alternative writ, commanding the trial court to vacate its order denying relator's motion to dismiss or to show cause for not doing so. The trial court did not vacate its order, so the mandamus case proceeded to briefing.

The final hearing for appointment of counsel in the criminal case, which the trial court described as the sixth setover for the appointment of counsel on the current indictment, was scheduled for April 17, 2025. That date was almost a year after relator's arraignment on the indictment and the same day as oral argument in this court. Following the hearing, the trial court entered a judgment dismissing the criminal case against relator without prejudice "due to lack of attorneys."[5]

## II.  ANALYSIS OF PRELIMINARY ISSUES

Before we can address whether, as relator claims, the trial court erred in denying his motion to dismiss his criminal case, we must address three preliminary issues: (1) whether this case is now moot; (2) if so, whether the case is nevertheless justiciable under ORS 14.175, which allows this

---

[5] Notwithstanding the trial court's dismissal of the charges *without* prejudice, the parties agree that the dismissal in this case was *effectively* a dismissal *with prejudice*, because the statute of limitations for the charged crimes precludes the state from refiling the charges. *See* ORS 131.125(8)(a) (providing generally that "prosecutions" for unenumerated felonies "must be commenced" within three years "after their commission"). Other crimes may have different limitations periods. *See* ORS 131.125(2) (20 years or longer, depending on age of victim); ORS 131.125(3) (six years or longer); ORS 131.125(4) (four years or longer); ORS 131.125(6), (7) (six years); ORS 131.125(8) (three years for unenumerated felonies, two years for unenumerated misdemeanors).

court to resolve certain moot cases that involve challenges to acts that are capable of repetition but likely to evade judicial review; and (3) if so, whether we can and should resolve the case, given that it is a mandamus case and mandamus relief is appropriate only if, among other things, the relator lacks a plain, speedy, and adequate remedy in the ordinary course of law.

A.   *Mootness*

As described above, after relator initiated this mandamus case, the trial court dismissed underlying criminal case without prejudice. As a result of that dismissal, we must determine whether this mandamus case is now moot. The state asserts that it is, and relator does not argue otherwise.

"Whether a case is moot depends on whether a justiciable controversy exists." *Rogue Advocates v. Board of Comm. of Jackson County*, 362 Or 269, 272, 407 P3d 795 (2017). A justiciable controversy is one in which the "interests of the parties to the action are adverse" and "the court's decision in the matter will have some practical effect on the rights of the parties to the controversy." *Rains v. Stayton Builders Mart, Inc.*, 359 Or 610, 624, 375 P3d 490 (2016) (internal quotation marks omitted). Thus, "[g]enerally speaking, a case becomes moot when a court's decision will no longer have a practical effect on the rights of the parties." *State v. K. J. B.*, 362 Or 777, 785, 416 P3d 291 (2018) (internal quotation marks omitted). In this case, relator has already received the relief he is seeking from this court—specifically, the dismissal of his criminal case without prejudice. The state has not appealed that dismissal, and the time for it do to so has passed. Therefore, this mandamus case will have no practical effect on the parties and is moot.

B.   *Justiciability under ORS 14.175*

Although this case is moot, it is nevertheless justiciable if it meets the requirements of ORS 14.175. As relevant here, ORS 14.175 allows a court to adjudicate a moot case if (1) a party is challenging the legality of an act of a public body, (2) the party had standing to commence the case, (3) the challenged act is capable of repetition, and (4)

the challenged act is likely to evade review in the future.[6] If those four requirements are satisfied, a court may choose to adjudicate the case. *Couey v. Atkins*, 357 Or 460, 522, 355 P3d 866 (2015) (explaining that ORS 14.175 "leaves it to the court to determine whether it is appropriate to adjudicate an otherwise moot case under the circumstances of each case"); *see also Penn v. Board of Parole*, 365 Or 607, 613, 451 P3d 589 (2019) ("[C]ourts are not *required* to decide any and every moot case that falls within the terms of ORS 14.175." (Emphasis in original.)).[7]

In this case, the parties agree that the first three requirements of ORS 14.175 are satisfied, as do we. First, relator is challenging the legality of an act of a public body; he is asserting that the state's failure to appoint named counsel to represent an eligible defendant violates Article I, section 11, of the Oregon Constitution. Second, relator had standing to commence this case; at the time he filed his mandamus petition, relator had moved to dismiss his criminal case based on the state's failure to appoint counsel and that motion had been denied. Third, the challenged act is capable of repetition; the failure to appoint counsel is a recurring issue in this state and will continue to affect defendants in the same way it affected relator. *See Penn*, 365 Or at 622 (holding that the "capable of repetition" requirement does not demand a showing that same party will be

---

[6] ORS 14.175 provides:

"In any action in which a party alleges that an act, policy or practice of a public body \*\*\* is unconstitutional or otherwise contrary to law, the party may continue to prosecute the action and the court may issue a judgment on the validity of the challenged act, policy or practice even though the specific act, policy or practice giving rise to the action no longer has a practical effect on the party if the court determines that:

"(1) The party had standing to commence the action;

"(2) The act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect;

"(3) The challenged policy or practice, or similar acts, are likely to evade review in the future."

[7] As we have previously noted, "ORS 14.175 may not represent 'the full scope of a court's constitutional authority to decide moot cases.'" *Woodland v. Dept. of Rev.,* 371 Or 334, 336 n 2, 536 P3d 985 (2023) (quoting *Penn*, 365 Or at 613 n 2). However, when the requirements of ORS 14.175 are satisfied, there is no need to look beyond the statute for authority to decide a moot case. *Penn*, 365 Or at 613 n 2.

affected again; it requires only that the challenged act "be reasonably susceptible to repetition as to someone").

But the parties disagree about whether the fourth requirement of ORS 14.175—that is, that the challenged act is likely to evade review—is satisfied. Relator argues that the state's failure to appoint counsel to represent eligible defendants in their criminal cases is likely to evade review because the defendants are unlikely to be able to timely and effectively assert that their constitutional right to counsel is being violated and that they are entitled to dismissal of their cases as a remedy. He asserts that unrepresented defendants "cannot be expected to know when and how to seek a dismissal remedy," and he points out that his challenge to the state's failure to appoint counsel is before this court only because of his volunteer counsel's limited-scope representation. In response, the state argues that the challenged act is not likely to evade review because, in some cases, eligible defendants will eventually have counsel appointed in their criminal cases and, if those defendants are convicted, they can bring direct appeals in which they can challenge the constitutionality of the delay in the appointment of their counsel.

When determining whether "[t]he challenged policy or practice, or similar acts, are likely to evade judicial review in the future," ORS 14.175(3), we focus on "whether the general type or category of challenge at issue is likely to evade being fully litigated—including by appellate courts—in the future," *Eastern Oregon Mining Association v. DEQ*, 360 Or 10, 17, 376 P3d 288 (2016). As the text of ORS 14.175(3) requires, the focus of the "general type or category" inquiry is on the challenged "policy, practice, or act" itself and whether "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Penn*, 365 Or at 615 n 4 (quoting *Weinstein v. Bradford*, 423 US 147, 149, 96 S Ct 347, 46 L Ed 2d 350 (1975)); *see generally Actions*, 1A CJS § 82 (2024) (explaining that the "evading review" inquiry concerns whether the duration of the challenged action is too short to be fully litigated before it ceases); *id.* ("[T]he inquiry is whether the activity itself is by nature so short in duration that it will

not be fully litigated before the objected to activity ends, as where the duration of the challenged action is short and the time required to complete an appeal is lengthy." (Footnote omitted.)). For example, in *Penn*, this court concluded that the relator's challenge to a post-prison supervision condition was likely to evade review because most post-prison supervision terms would expire before such a challenge could be resolved by this court. *Penn*, 365 Or at 623.

In addition, whether a challenge is likely to evade review depends on whether "it is *probable* that a similar challenge will evade judicial review in the future. *Certainty is not required.*" *Couey*, 357 Or at 479 (emphases added). Consequently, a court may determine that a challenge is likely to evade review even when there are other instances in which parties were able to complete litigation of the same or similar challenges before those challenges went moot. *Penn*, 365 Or at 623. As this court has stated, "the fact that there are a few reported cases in which a party in similar circumstances was able to complete the litigation before the challenged act ceased or expired is insufficient to establish that the act is not likely to evade review." *Id.*

Applying those principles here, we conclude that the challenged act—*viz.,* the failure to appoint named counsel to represent an eligible defendant post-arraignment—is likely to evade review. Because of the public defense crisis, trial courts across the state are frequently unable to appoint counsel to eligible defendants. Generally, a defendant needs counsel to litigate whether an act violates their constitutional rights. Consequently, most indigent defendants will be unable to timely and effectively challenge the state's failure to provide them counsel. As relator points out, he was able to file his motion to dismiss and then bring this mandamus case only because a lawyer volunteered to represent him on a limited basis. Unlike relator, most indigent defendants will be unable to challenge the state's initial failure to appoint counsel in their criminal cases until the state eventually appoints counsel for them in those cases. But by that time, the challenged act will have ended. So, the challenged act is likely to evade review because, by its nature, it is likely to end before a challenge can even be initiated,

much less fully litigated. And, even in the unusual situations where an indigent defendant is able to initiate a challenge, either on their own or through volunteer counsel, the challenged act could still end before the challenge is fully litigated because, while the challenge is pending, the state could appoint counsel or dismiss the criminal case, as happened here.

As mentioned, the state argues that the challenged act is unlikely to evade review because, *if* counsel is appointed and *if* the defendant is ultimately convicted, the defendant can file a direct appeal and the effects of any delay in the appointment of counsel can be reviewed then. However, as we have explained, whether a challenged act is likely to evade review requires an assessment of whether the act itself is likely to end before the challenge is fully litigated, and the challenged act at issue here, which is the failure to appoint counsel, will necessarily end when counsel is appointed.

Moreover, the state's argument assumes that relator's challenge is the type that can be addressed on direct appeal of a defendant's conviction. But that assumption is based on a misunderstanding of relator's claim, which is that the failure to appoint counsel is a constitutional violation that causes harms independent and irrespective of the ultimate judgment in the defendant's case but that nevertheless require a remedy. As such, relator's claim is similar to a defendant's claim that they are being subjected to pretrial restraints that violate their rights, which this court has held to be a type of claim that will evade review if it is not addressed pretrial. *See, e.g.*, *State v. McDowell*, 352 Or 27, 32, 279 P3d 198 (2012) (allowing petition for writ of mandamus to compel pretrial release of defendant whose pretrial detention exceeded the statutory maximum).

To be sure, there may be harms that result from the delayed appointment of counsel that affect the ultimate outcome of the criminal case. For example, the delay could result in the loss of evidence and thus prevent the defendant from having a fair trial. Those types of harms can be the basis for motions to dismiss a case with prejudice, and if a trial court denies such a motion, the denial can be challenged through

a direct appeal. But those harms are different from what relator is alleging here. Relator is asserting that his constitutional right to counsel was violated, and that the violation caused pretrial harms distinct from any effects that the lack of counsel might have on the outcome of the trial. At bottom, he is claiming that the state cannot maintain a criminal case against him—thereby subjecting him to contemporaneous, negative consequences—for an extended period of time without providing him counsel to resolve the case. That is a type of claim that is likely to evade review because the pretrial situation that relator is challenging is likely to end before a challenge to it can be initiated, much less fully litigated.[8]

Consequently, we conclude that the four requirements for review under ORS 14.175 are satisfied here: relator is challenging an act of a public body; he had standing to do so when he initiated this mandamus case; the act is recurring; and act is likely to end before challenges to it can be fully litigated.

Given that conclusion, the question becomes whether this is the type of case in which it is appropriate for this court to exercise its discretion under ORS 14.175. *See, e.g.*, *Penn*, 365 Or at 624 (exercising discretion under ORS 14.175 because the petitioner raised a "serious challenge" to the constitutionality of the board's imposition of a supervision conduct and a decision in the case would have "broader relevance"). We conclude that it is. The legal issues in this case concern a core constitutional right that is essential for the functioning and integrity of our legal system, and they arise out of an ongoing public defense crisis, which affects many persons and institutions throughout the state. Moreover, as relator points out, there is no consistent approach among the state's trial courts when an attorney is unavailable to

---

[8] As noted, in this court, relator seeks dismissal of his criminal case *without* prejudice. When a criminal case is dismissed *without* prejudice, the state can bring a later case against the defendant for the same crimes, provided that that case is not barred for other reasons, such as the expiration of the applicable statute of limitations. But if a case is dismissed *with* prejudice, the state cannot bring a later case for the same crimes. As relator himself acknowledges, whether a delay in the appointment of counsel requires dismissal *with* prejudice will depend on the case-specific effects of the delay on the defendant's ability to present a defense and receive a fair trial.

be appointed to represent an eligible criminal defendant.[9] Exercising our discretion under ORS 14.175 to resolve the legal issues in this case will help ensure that the right to counsel is protected consistently across the state.

C.   *Availability of Mandamus Relief*

Because this case comes to this court on relator's petition for a writ of mandamus, we must address one more preliminary matter: whether this is the type of case in which the extraordinary remedy of mandamus relief is available. This court may issue a writ of mandamus to compel a lower court to perform a legally required act. ORS 34.110; *see HotChalk, Inc. v. Lutheran Church—Missouri Synod*, 372 Or 249, 255-56, 548 P3d 812 (2024) (explaining that mandamus relief is available if the trial court had a "legal duty to act in a certain way"). But "the writ shall not be issued in any case where there is a plain, speedy and adequate remedy in the ordinary course of the law." ORS 34.100.

The state contends that mandamus relief is not available here because relator has a plain, speedy, and adequate remedy in the form of a direct appeal. Generally, direct appeal is regarded as a plain, speedy, and adequate remedy in criminal cases. *State ex rel Automotive Emporium v. Murchison*, 289 Or 265, 267, 611 P2d 1169, *reh'g den*, 289 Or 673, 616 P2d 496 (1980); *see also State ex rel Maizels v. Juba*, 254 Or 323, 333, 460 P2d 850 (1969) (explaining that challenges to denials of demurrers and motions to suppress can be raised on direct appeal, as opposed to mandamus). But that general rule does not apply when a direct appeal will not vindicate a relator's rights. *See, e.g., State v. Moore*, 361 Or 205, 212, 390 P3d 1010 (2017) (holding that a mandamus action is an appropriate means to challenge a trial court's denial of defendant's motion to dismiss on double-jeopardy grounds because "the right to appeal after

---

[9] Relator asserts that trial court responses to the unavailability of counsel for indigent defendants vary "from court to court, from judge to judge, and from case to case." Relator describes three different approaches: (1) in Multnomah County, trial courts appear to have had a policy of dismissing cases where defendants were unrepresented for a period of time, but then to have changed that policy; (2) in Washington County, trial courts did not dismiss cases, but would allow defendants to "jump the line" when they pursued other avenues to challenge their lack of counsel; and (3) in Marion County, trial courts appointed public defenders despite their assertions that they lacked the capacity to take additional cases.

a conviction would not vindicate his constitutional right to be free from a second prosecution for the same offense"); *State ex rel Anderson v. Miller*, 320 Or 316, 322, 882 P2d 1109 (1994) (holding that a mandamus action is appropriate under certain circumstances where "direct appeal will not sufficiently serve to vindicate a party's rights with regard to discovery"). As explained above in our discussion of why relator's challenge is the type that will likely evade review, direct appeal of a judgment of conviction, in the event that a defendant is convicted, will not provide an opportunity to address the alleged pretrial harms resulting from the failure to appoint counsel. Consequently, we conclude that relator does not have a "a plain, speedy and adequate remedy in the ordinary course of the law," ORS 34.110, that would preclude mandamus relief.

Whether relator is entitled to mandamus relief depends on whether, as he asserts, the trial court had a legal duty to grant his motion to dismiss. The answer to that question is inextricably intertwined with the answers to the constitutional questions to which we now turn.[10]

## III.    ANALYSIS OF CONSTITUTIONAL ISSUES

As noted, this case presents three legal questions: (1) whether the failure to appoint counsel to represent relator violated his right to counsel under Article I, section 11, of the Oregon Constitution; (2) if it did, whether dismissal of the criminal case without prejudice was an appropriate remedy; and (3) if it was, whether the trial court was required to dismiss the case after relator had been unrepresented for a certain period of time. Because the parties' competing arguments help to more precisely frame the issues that we need to resolve, we start there.

### A.    *The Parties' Arguments*

Relator argues that, having been arraigned on the current indictment, his Article I, section 11, right to counsel had attached and continued "uninterrupted" thereafter. He

---

[10] The constitutional questions are novel, but "mandamus can be used to decide a novel legal question." *State ex rel Kristof v. Fagan*, 369 Or 261, 285, 504 P3d 1163 (2022); *see also, e.g.*, *Gray*, 370 Or at 135-36 (announcing, in a mandamus case, that the scope of the state constitutional right to counsel includes the right to have counsel present when the defendant testifies before a grand jury).

further argues that, once that right had attached, the failure to appoint named counsel within a reasonable period thereafter violated his right to counsel under the state constitution.

According to relator, Article I, section 11, does not permit "the complete deprivation of counsel for *any* period of time," let alone the indefinite deprivation of counsel "for months and, in some cases, years, " while criminal charges remain pending. (Emphasis in original). Noting that the right to counsel is the right through which other constitutional rights are given effect, relator explains that his lack of counsel prevented him from being able to respond to the state's exercise of its prosecutorial powers over him and prepare a defense. All the while, relator continues, he remained subject to "restraints on his individual liberties" as a consequence of the pending charges.

Relator contends that such a complete, indefinite denial of counsel calls for the court to fashion a bright-line remedy to restore a criminal defendant to the position that the defendant would have been in had the state remained within the limits of its authority. As a general proposition, relator argues that the "only constitutionally adequate remedy" in these circumstances is dismissal of the criminal charges without prejudice after no more than 30 days without counsel.

For its part, the state agrees that relator's right to counsel had attached in this case. It also concedes that "the trial court was required to appoint counsel" for relator "after determining that he was financially eligible" and that the court "did not satisfy that requirement by appointing 'OPDC' *** as a placeholder for an actual lawyer."

However, according to the state, the scope of relator's right to counsel following its attachment was limited: it guaranteed only the right to have counsel present at a "critical stage" and appointed "within a reasonable time before a critical stage occurs." Put simply, the state's position is that there is no constitutional problem if an eligible criminal defendant lacks appointed counsel post-arraignment as long as the defendant is not required to participate in a

"critical stage" without the presence of counsel and the trial court "continue[s] the case (and any critical stages in the case) until" counsel can be appointed.

The state further contends that, contrary to relator's argument, "[a] trial court is not compelled to dismiss the charges [against an eligible criminal defendant] any time there is a 30-day gap in representation." Instead, the state argues that "[d]ismissal is required only if an unreasonable delay causes incurable prejudice to an individual defendant." The state reasons that delays in the appointment or substitution of counsel that, in turn, create delays in scheduling or holding a critical stage, including trial, can be "assessed in the speedy trial context on a case-by-case basis." In that context, the state explains, a defendant who can establish that the "delay in the appointment of counsel result[ed] in prejudice to [the] defendant's ability to prepare a defense" would be entitled to a "dismissal *with prejudice*." (Emphasis added.)

B.  *Whether Relator's Article I, Section 11, Right to Counsel Was Violated*

With the issues framed by the parties' arguments, we turn to the relevant law, beginning with the law relating to the nature of the right to counsel and then turning to the law relating to the scope of the right. We then apply the law to the facts of this case to determine whether relator's right to counsel was violated.

1.  *The nature of the right to counsel*

Article I, section 11, guarantees criminal defendants rights that are intended to ensure that criminal prosecutions are fair and reliable. It provides, in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor[.]"[11]

---

[11] The quoted portion of Article I, section 11, is the full text of the original section. It was amended in 1932 and 1934 to add provisions relating to jury trials, which are not relevant to the issues in this case.

The portion of Article I, section 11, that is at issue here is the guarantee that, "[i]n all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel[.]" That guarantee is a core component of our criminal justice system, which is an adversarial one. *State v. Craigen*, 370 Or 696, 704, 524 P3d 85 (2023). In an adversarial system, opposing parties conduct their own investigations, develop competing legal and factual theories, and present evidence and arguments to support those theories in court. Adversarial systems are premised on the belief that the best way to resolve legal disputes correctly is through a competitive process, with each party making its own case. *State v. Lacey*, 364 Or 171, 180, 431 P3d 400 (2018). Consequently, in an adversarial system, each party plays an essential role in ensuring that the legal rulings are correct and factual findings are accurate. If one party is unable to develop and present its case, then the system is compromised. By guaranteeing criminal defendants the right to counsel, Article I, section 11, helps ensure that our adversarial criminal justice system functions properly. As this court has observed, without the right to counsel, "a trial court cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *State v. Cotter*, 373 Or 381, 387, 567 P3d 1034 (2025) (internal quotation marks omitted).

The right to counsel under Article I, section 11, serves as a check on governmental powers. Oregon's founders were concerned that governmental powers could be misused, and—like many other provisions of the Oregon Constitution—Article I, section 11, exists to protect against such misuse. *See Stevenson v. Holzman*, 254 Or 94, 101-02, 458 P2d 414 (1969) (stating that the purpose of the right to counsel "is to give assurance against deprivation of life or liberty except strictly according to law" (internal quotation marks omitted)). The founders gave the state the power to prosecute persons for crimes while simultaneously giving such persons the right to counsel to defend against the prosecutions. The right to counsel helps ensure that "the state abides by the legal limits on its authority, that criminal proceedings are fair, and that verdicts are reliable." *Craigen*, 370 Or at 705.

Criminal prosecutions carry significant consequences for defendants. Obviously, for those who are convicted, the potential consequences include fines, restitution, probation, jail, and prison. But other consequences flow simply from being charged. Although they are entitled to a presumption of innocence until they are convicted, defendants who are charged may nonetheless be subjected to restrictions on their liberty and incur costs in time and money to attend court and respond to the charges. In addition, pending criminal charges can affect many aspects of a defendant's life, including their personal and employment relationships. Article I, section 11, reflects the founders' recognition that, given the significant and often life-altering consequences of a criminal prosecution, it is essential that criminal defendants have the right to call upon counsel to help them respond to the state's prosecutorial actions against them.

The right to counsel is necessary because it can be difficult for persons who are untrained in the law to respond to the state's actions in a criminal prosecution. They are likely to be unfamiliar with the substantive law defining crimes and defenses and the procedural law governing how cases must be litigated. As this court has stated,

> "'[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.'"

*Stevenson*, 254 Or at 100 (quoting *Powell v. Alabama*, 287 US 45, 68-69, 53 S Ct 55, 77 L Ed 158 (1932)); *see also id.*

("The assistance of counsel will best avoid conviction of the innocent[.]"). The right to counsel "is meant to counteract the handicaps of a suspect enmeshed in the machinery of criminal process." *State v. Sparklin*, 296 Or 85, 92, 672 P2d 1182 (1983) (internal quotation marks omitted); *see also Craigen*, 370 Or at 704 ("The state utilizes trained professionals to represent its interests in prosecutions, and Article I, section 11, guarantees defendants the right to do the same."). Thus, the right to counsel is particularly important because it affects a defendant's ability to assert their other rights, both substantive and procedural. *Craigen*, 370 Or at 705.

The right to counsel in a criminal prosecution is guaranteed to all persons, including those who cannot afford to retain their own counsel. That is so for the reasons that the United States Supreme Court explained in *Gideon v. Wainwright*, 372 US 335, 83 S Ct 792, 9 L Ed 2d 799 (1963), which this court has repeated in connection with Article I, section 11. *Craigen*, 370 Or at 704 n 7. In *Gideon*, the Supreme Court stated that its "well-considered precedents" and "reason and reflection" required it "to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth." 372 US at 344; *Craigen*, 370 Or at 704 n 7 (quoting same). The Court pointed out that, in criminal prosecutions, governments are represented by lawyers, as are most defendants who can afford to hire their own lawyers:

> "Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. *Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the wide-spread belief that lawyers in criminal courts are necessities, not luxuries.* The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and

laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him."

*Gideon*, 372 US at 344 (emphasis added); *see Craigen*, 370 Or at 704 n 7 (quoting *Gideon*, 372 US at 344).

Recognizing the importance of counsel, this court has ruled that Article I, section 11, "mandates the appointment of counsel for all indigent defendants whose conviction may result in a loss of liberty." *Stevenson*, 254 Or at 103-04. In doing so, we explained that the rule was consistent with "our commitment to individual liberty and equality before the law." *Id.* at 104.

Although defendants are the immediate beneficiaries of the right to counsel, they are not the only beneficiaries. As discussed above, defense counsel help ensure that our adversarial system functions properly. In doing so, they protect the integrity of, and public confidence in, our criminal justice system. *See Craigen*, 370 Or at 705 (stating that the constitutional rights of individuals, including the right to counsel, "help preserve the rule of law and the integrity of the legal system"). They also protect the interests of the community at large, including the interests in ensuring that the persons who have committed crimes are correctly identified; that legal requirements for investigations, detentions, pleas, trials, convictions, and sentences are satisfied; and that sentences are structured to promote rehabilitation and protect the community not only through incarceration but also upon eventual release, which occurs in most criminal cases.

In sum, the Article I, section 11, right to counsel is a fundamental Oregon right. It is essential to the fairness of our adversarial legal system, in which disputes are resolved through competing presentations of law and evidence. It guarantees criminal defendants access to advocates who can protect their substantive and procedural rights, and it is necessary given the significant consequences and complexities of criminal prosecutions. It protects the interests of

individual defendants, as well as the community at large, by helping to ensure that criminal prosecutions are conducted in accordance with the law and that the results of those prosecutions are reliable.

2.   *The scope of the right to counsel*

Generally, a defendant's Article I, section 11, right to counsel "begins when criminal proceedings have been initiated, at which point the right is said to attach." *State v. Gray*, 370 Or 116, 129, 515 P3d 348 (2022). In this case, the parties agree that relator's right to counsel attached in connection with the current indictment when relator was arraigned. But they disagree about the scope of the right. That is, they disagree about whether the scope of the right includes the right to have the assistance of counsel at a stage when, as in relator's case, a defendant has been arraigned, but the state is not conducting any court proceedings regarding the merits of the charges.

The scope of the right to counsel depends on the particular circumstances at issue. *See State v. Davis*, 350 Or 440, 478, 256 P3d 1075 (2011) ("After the right attaches, the court may evaluate the particular circumstances * * * to determine the scope of the right[.]"); *see, e.g.*, *Gray*, 370 Or at 130-35) (determining whether the scope of the right to counsel includes the right to have counsel present at when a defendant testifies before the grand jury). When determining the scope of the Article I, section 11, right to counsel, this court has applied the methodology described in *Priest v. Pearce,* 314 Or 411, 415-16, 840 P2d 65 (1992), for construing state constitutional provisions. *See, e.g.*, *Davis*, 350 Or 446 (summarizing steps); *id.* at 462-77 (applying steps). Under *Priest,* "we examine the text of the constitution in its historical context, along with relevant cases interpreting it." *Couey*, 357 Or at 490 (citing *Priest*, 314 Or at 415-16). "In conducting that examination, our purpose is not to freeze the meaning of the state constitution to the time of its adoption, but is instead 'to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances.'" *Id.* (quoting *Davis*, 350 Or at 446).

   This court has reviewed the history of the right to counsel in prior cases. *E.g.*, *Davis*, 350 Or at 464-72; *State v. Prieto-Rubio*, 359 Or 16, 24, 376 P3d 255 (2016). In *Davis*, this court traced the right to counsel from English common law through the adoption of the Oregon Constitution. 350 Or at 464-72. We explained that, "[a]t English common law, a defendant accused of a felony was actually prohibited from being represented by counsel" but that the American colonies charted a different course. *Id*. at 465. Early colonial governments "enact[ed] statutory guarantees to the assistance of counsel in serious criminal cases." *Id*. at 465-66. And, after the Declaration of Independence, "a majority of states adopted constitutions that explicitly recognized a right to the assistance of counsel." *Id*. at 466. The right was based on a recognition that persons accused of crimes were often unequipped to respond to the state's actions against them. *Id*. at 467-68. As the Louisiana Supreme Court explained in a passage quoted in *Davis*,

> "[the right] was a reproach to the Common Law of England that prisoners were not allowed the aid of counsel when accused of crimes. Their ignorance and timidity when prosecuted by the high officers of government, their want of self possession when life and liberty was put in jeopardy rendered them incapable of defending themselves, and often the greatest injustice and oppression occurred. This led to the guarantee of the right to counsel in our liberal constitutions, and the right should be liberally construed."

*Id*. at 468 (quoting *State v. Cummings*, 5 La Ann 330, 331-32 (1850)).

   In *Davis*, this court observed that the historical context of the right to counsel indicates that, before the Civil War, the right "would have been understood to guarantee a right to counsel at trial, and, perhaps, some measure of preparation for trial following the commencement of formal adversary proceedings." *Id*. at 472. That is because, "before the Civil War, organized police forces as we know them did not exist, professional prosecutors were rare, criminal investigations of the sort that we are familiar with did not occur, and the evidence against a criminal defendant was marshalled during the trial itself." *Id*. at 469. But "[a]s the nature of law enforcement and public criminal prosecution

[have] changed," courts have had to consider whether the scope right to counsel includes the right to the assistance of counsel at stages other than trial. *Id.* at 469. Generally, issues regarding the scope of the right to counsel have been presented in cases where the defendant has asserted a right to have counsel present during a particular nontrial event, like police questioning.

This court has ruled that, after a defendant's right to counsel has attached, the defendant has the right to have counsel present at certain nontrial events, including out-of-court events at the beginning and end of a prosecution. For example, in *Sparklin*, this court ruled that a defendant who is represented by counsel on charged crimes has the right to have counsel present during police questioning about those crimes. 296 Or at 93 ("Once an attorney is appointed or retained, there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing the defendant on that charge is notified and afforded a reasonable opportunity to attend.") Later, in *Prieto-Rubio*, this court ruled that, in addition to having the right to have counsel present during police questioning about *charged* crimes, a represented defendant has the right to have counsel present during police questioning about *uncharged* crimes when "it is objectively reasonably foreseeable that the questioning will lead to incriminating evidence" concerning the charged crimes. 359 Or at 18.

When determining the scope of the right to counsel, this court has focused on the principles underlying the right and the purposes of the right. *See Prieto-Rubio*, 359 Or at 36 (focusing on the purpose of the right); *id.* at 25 (stating that a defendant has the right to have counsel present when "counsel's presence could prevent prejudice to [the] defendant"); *see also Gray*, 370 Or at 129 (observing that this court in *Davis* and *Prieto-Rubio* analyzed the history and purposes of the right in ways that are instructive when determining the scope of the right). As discussed above, the basic principle underlying the right is that criminal prosecutions should be fair, reliable, and conducted in accordance with the law. *See, e.g.*, *Cotter*, 373 Or at 387 (without the right to counsel, "a trial court cannot reliably serve its

function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair"); *Craigen*, 370 Or at 705 (explaining that the right to counsel helps ensure that "the state abides by the legal limits on its authority, that criminal proceedings are fair, and that verdicts are reliable"). The primary purpose of the right is to give effect to that basic principle by guaranteeing defendants the assistance of counsel to protect their legal interests when the state exercises its prosecutorial powers over them. *See, e.g.*, *Stevenson*, 254 Or at 100 (generally, a defendant "'has small and sometimes no skill in the science of law'" and "'requires the guiding hand of counsel at every step in the proceedings against him'" (quoting *Powell*, 287 US at 69)); *Sparklin*, 296 Or at 93 (the right to counsel "is meant to counteract the handicaps of a suspect enmeshed in the machinery of criminal process" (internal quotation marks omitted)). Consequently, in cases involving whether a defendant's right to counsel includes the right to have counsel present at a particular event, this court has considered whether the defendant's legal interests would be at risk of prejudice if counsel was not present. When doing so, this court has considered the nature of the event at issue and how counsel could protect the defendant's rights during the event.

*State ex rel Russell v. Jones*, 293 Or 312, 647 P2d 904 (1982) is illustrative. In *Russell,* a mandamus case, the relator—who had pleaded "no contest" to a criminal charge and was awaiting sentencing—asserted that the scope of the right to counsel under Article I, section 11, includes the right to have counsel present during presentence interviews. *Id*. at 314; *see generally* ORS 137.530 (governing presentence investigations); ORS 137.090 (authorizing trial courts to designate persons to conduct presentence investigations). This court agreed. *Russell*, 293 Or at 317. In doing so, we considered the nature of presentence interviews and how counsel could assist a defendant during an interview. *Id*. at 317-20. We acknowledged that presentence interviews do not relate to whether a defendant is guilty of the charged crimes. *Id*. at 318 ("After guilt is no longer in issue, the inquiry is into defendants' background, present situation and attitude."). We also acknowledged that a presentence

interviewer is required to prepare a report, which defense counsel can challenge and supplement at sentencing, and, therefore, there "rarely" would be a "risk of irremediable harm" if counsel was not present at a presentence interview. *Id*. at 318. Nevertheless, we concluded that Article I, section 11, guarantees a defendant the right to have counsel present during presentence interviews because "circumstances are conceivable where the presence of counsel would be helpful." *Id*. at 319. In some cases, counsel could be "helpful to the fact-gathering process or to the protection of the clients' rights[.]" *Id*. at 320. Given those possibilities, we ruled that "counsel cannot be barred" from presentence interviews. *Id*.[12]

This court's most recent case concerning the scope of the right to counsel under Article I, section 11, is *Gray*, 370 Or 116, another mandamus case. In *Gray*, one of the issues was whether a defendant who exercises their statutory right to testify before a grand jury has a right, under Article I, section 11, to have their counsel present in the grand jury room. *Id*. at 128. Consequently, this court had to consider the scope of the Article I, section 11, right to counsel. We began by noting that, as evidenced by our analyses in *Davis* and *Prieto-Rubio*, when determining the scope of the Article I, section 11, right to counsel, we are guided by the principles underlying the right and purposes of the right. *Gray*, 370 Or at 128-29. Accordingly, our cases have "always focus[ed] on whether the absence of counsel would risk prejudice to the defendant's legal interests." *Id*. at 130 (citing, *inter alia*, *Russell*, 293 Or at 315 ("[A] criminal defendant's guarantee of the assistance of counsel exists at least at all court proceedings from arraignment through probation revocation as well as all post-indictment out-of-court critical stages where, without the assistance of counsel, the legal interests of the defendant might be prejudiced."); *Prieto-Rubio*, 359 Or at 25 ("Under Article I, section 11, the

---

[12] In *Russell*, this court made it clear that, although we were holding that the scope of Article I, section 11, includes the right to have counsel present at presentencing interviews, we were "not hold[ing] that the presence of counsel is required at every presentence interview or that [their] absence would constitute ineffective assistance of counsel"; rather, we were holding that Article I, section 11, requires "that counsel may not be barred from attendance at a presentence interview." 293 Or at 318.

scope of the right to counsel encompasses stages in criminal proceedings in which counsel's presence could prevent prejudice to a defendant.")).

Applying that standard, this court held that a defendant's right to counsel under Article I, section 11, includes the right to have counsel present in the grand jury room when the defendant testifies. *Id.* at 132-33. It did so because counsel's presence "would lessen the risk of prejudice" to the defendant's interests. *Id.* at 132; *see also id.* (explaining that in *Russell*, it "found a constitutional right to the presence of counsel when there was only a low chance that counsel would be able to protect a defendant's interests"). As it had in earlier cases, this court considered the nature of the circumstances at issue and what counsel could do in those circumstances to protect a defendant's interests. *Id.* We concluded that counsel's presence in the grand jury room could be helpful to the relator because, "[a]t a minimum, counsel's presence means that relator may consult with a fully informed counsel, who will have directly heard the question and can provide relator with informed advice." *Id.*

In sum, because the primary purpose of the right to counsel is to protect a defendant's rights in a criminal prosecution, a defendant has the right to the assistance of counsel in circumstances where, without that assistance, the defendant's legal interests would be at risk of prejudice.

### 3. *Application*

Having reviewed the relevant law regarding the nature and scope of the Article I, section 11, right to counsel, we now apply that law to determine whether relator's right to counsel was violated.

As mentioned, the parties do not dispute that defendant was arraigned on the current indictment or that his Article I, section 11, right to counsel had attached by that time. Nor do the parties dispute that the trial court was required to appoint named counsel for relator after determining that he was financially eligible and that the appointment of OPDC—as a placeholder for a named attorney—was insufficient. In fact, the state concedes that point, and we accept its concession.

Instead, the parties' dispute centers on the *scope* of the right to counsel under the circumstances of this case, in which an eligible criminal defendant invoked his right to counsel but the state failed to appoint named counsel to represent him post-arraignment. As described above, relator argues that his right to counsel was violated because the state failed to appoint counsel within a reasonable period after his right to counsel attached. The state counters that the failure to appoint counsel did not violate defendant's right to counsel because the scope of that right is limited. According to the state, the right guarantees the assistance of counsel only in connection with "critical stages," by which the state appears to mean adversarial contacts between the state and a defendant, such as police questioning or court hearings. Therefore, according to the state, as long as relator's case did not proceed to any critical stages, his right to counsel was not violated.

The state is correct that a defendant has a right to have counsel present at "critical stages." But, as this court has held, a defendant's Article I, section 11, right to counsel is not that limited. *Davis*, 350 Or at 475; *see Sparklin*, 296 Or at 92 n 9 ("When Article I, section 11 is implicated '[t]he right of an accused under Article I, section 11, to be heard by himself or counsel, * * * , is guaranteed in "all criminal prosecutions," not limited to "critical stages" of such prosecutions.'" (Quoting *State ex rel Russell v. Jones*, 293 Or 312, 321, 647 P2d 904 (1982) (Lent, J., concurring) (brackets and ellipses in *Sparklin*).)). Consequently, rather than frame the question as whether the stage in the proceedings in which relator was without counsel constitutes a "critical stage," we ask whether the absence of counsel would risk prejudice to the defendant's legal interests, or stated differently, whether the absence of counsel would undermine the purposes of the right to counsel.

To answer that question, we consider what assistance counsel could provide to a defendant, even outside of an adversarial contact like police questioning or a court hearing. Generally stated, defense counsel's role is to respond to the state's exercise of its prosecutorial powers over a defendant. That role is not limited to being present at certain

events. There are numerous actions that defense counsel can take to protect a defendant's rights and to prepare and present a defense. Many of those actions can be taken on defense counsel's own initiative, outside of court, and before any trial.

Defense counsel has a role to play as soon as a defendant is charged with a crime. Defense counsel needs to promptly contact the defendant to explain the defendant's rights and options and to gather information from the defendant. Many defendants do not understand what is happening to them and how their cases will proceed. And they may need to speak candidly to a lawyer about the events underlying the charges while those events are still recent and to have those discussions protected by the attorney-client privilege.

In addition, defense counsel needs to assess the charges against the defendant. As mentioned above, Article I, section 11, guarantees a defendant the right "to demand the nature and cause of the accusation against him[.]" That is something that counsel can help a defendant do. Indeed, it is something that a defendant will probably need counsel to do. *See Stevenson*, 254 Or at 100 ("'Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad.'" (Quoting *Powell*, 287 US at 69.)). If a defendant receives a charging instrument that is deficient, they can move against it by filing a demurrer. That can be done at the outset of a criminal prosecution because a demurrer is based on the charging instrument itself. ORS 135.630(2) (authorizing demurrers based on "the face" of the charging instrument). There are several bases for demurrers, including that "the facts stated [in the charging instrument] do not constitute an offense" and that the charging instrument "contains matter, which, if true would constitute a legal justification or excuse of the offense charged or other legal bar to the action." ORS 135.360(4), (5). If a demurrer is allowed, then the state cannot proceed on the charging instrument. Thus, at the outset of a criminal prosecution, a defendant has rights that defense counsel can assert based solely on

the charging instrument and that can result in the termination of case.

Defense counsel also can assist a defendant by investigating the alleged crimes. *See Sparklin*, 296 Or at 92 n 9 ("There can be no question that the right to an attorney during the investigative stage is at least as important as the right to counsel during the trial itself."). Defense counsel can assert a defendant's right to discovery under ORS 135.815, which requires the state to provide information and materials. *See also* ORS 135.845 (requiring the state to provide discovery to a defendant "as soon as practicable" following the filing of the charging instrument). Defense counsel can also take steps to secure physical evidence before it is lost and to record witness statements before memories fade. They may also be able to arrange for medical and psychological examinations of the defendant close in time to the alleged crimes, when the examinations will be most relevant. In addition, defense counsel can determine whether the defendant has any defenses, such as self-defense or defense of others, that the defendant could present to the grand jury. *See* ORS 132.320(12) (providing that a defendant, who is represented by counsel, has a right to appear before the grand jury, if— prior to the filing of an indictment—counsel files a written notice requesting the appearance). Thus, if a defendant has counsel early in a criminal prosecution, counsel can arrange to have the defendant testify before the grand jury, and the defendant's testimony could cause the grand jury to decide not to indict the defendant.

Defense counsel can also take steps to resolve a criminal prosecution by negotiating a civil compromise or arranging for the defendant to participate in a diversion program, each of which could result in the eventual dismissal of the charges against the defendant. *See* ORS 135.703 - ORS 135.709 (civil compromises); ORS 135.881 - ORS 135.925 (diversion agreements); ORS 813.200 - ORS 813.270 (DUII diversion charges); ORS 430.450 - ORS 430.555 (diversion to treatment programs).

Defense counsel can also resolve cases through plea negotiations. If counsel reviews the charging instrument, conducts any necessary investigation, and assesses potential

sentences, counsel may be able to negotiate a plea in a fairly short time, especially in cases where there is little dispute about the relevant facts, law, and potential sentences.

In addition to taking steps to resolve the charges against a defendant, defense counsel has a role to play in protecting a defendant's rights by ensuring that any prosecutorial powers that the state is exercising over the defendant are being exercised lawfully. The state's prosecutorial powers include its power to exercise control over a defendant's liberty pending resolution of the defendant's case, which the state does when it holds a defendant in jail, puts a defendant on supervision, or otherwise restricts the defendant's freedoms. Defense counsel can ensure that the state's exercise of those controls is lawful. For example, defense counsel can make sure that any release conditions comply with the law.

In sum, defense counsel's role is not limited to being present at events when the state is confronting the defendant. It is not merely reactive; it is proactive. There are many actions that defense counsel can take to protect a defendant's rights in the context of a criminal prosecution, including actions that counsel can (and may have to) take early in a prosecution. But in cases like this one, defendants are left without anyone to take those actions.

The failure to appoint counsel within a reasonable time harms defendants in several ways. First, defendants with charges pending against them are subjected to restraints on their liberty, while being deprived of the ability to challenge or modify them. Every defendant with an open case is required to appear when ordered by the trial court. ORS 135.290 (governing contempt); *see also* ORS 135.250 (governing pretrial release). If a defendant fails to do so, the court can issue a warrant for the defendant's arrest, and the defendant can be criminally prosecuted. ORS 162.195 (defining second-degree failure to appear); ORS 162.205 (defining first-degree failure to appear). If the defendant posted funds to obtain a security release, they could lose those funds. ORS 135.280(3) (providing for the forfeiture of funds or property posted for security release). Consequently, in cases like relator's, defendants must continue to appear

for hearings, under threat of arrest and criminal prosecution, only to be told that the state is unable to appoint counsel and that they will have to return again later.

In addition to being subject to the control of the court, most defendants are subject to other restrictions on their liberty. All defendants who are released from custody pending resolution of their cases are subject to mandatory conditions, including that they not leave the state without permission of the court. ORS 135.250(1). Many of those defendants are subject to additional restrictions, including restrictions on contacting certain persons or going to certain places. *See* ORS 135.260(1)(b) (authorizing restrictions on the defendant's "activities, movements, associations and residences"); ORS 135.247 (requiring courts to prohibit defendants from contacting alleged victims of certain types of crimes). Defendants who are on release may also have affirmative obligations, including reporting to a release supervisor. ORS 135.260(1)(a). If a defendant breaches a release restriction, they can be arrested and detained, and they may lose any money posted as security. ORS 135.280. They may also be held in contempt of court. ORS 135.290.

Although pretrial restraints on a defendant's liberty are permissible and usually appropriate, what is different for relator and others is that they are subject to those restraints while being denied the means they need to respond to them.

Second, the defendant cannot move their case forward. In addition to restraints on their liberty, defendants experience other consequences as a result of being charged with a crime, regardless of the presumption of innocence. These include effects on a person's relationships, employment, and housing opportunities. Although these consequences exist for all criminal defendants, with or without counsel, defendants like relator experience them for an extended and indefinite time while being unable to respond to the charges against them. They do not have a legal advocate to review the state's charges and evidence, gather and preserve defense evidence, and take steps to advance their case toward resolution, whether through dismissal, plea, or trial.

Meanwhile, the state has counsel to continue to collect evidence, interview witnesses, and take other steps to prepare its case. In addition, the failure to appoint counsel undercuts the protection of the statute of limitations. The statute requires the state to initiate a criminal prosecution within a certain period of time after the alleged crime.[13] One of the ideas underlying the statute is that the passage of time can harm a defendant's ability to respond to the charges. If the state charges a crime after the limitations period has passed, a defendant is entitled to dismissal with prejudice. That is, the defendant has a simple, statutory basis for dismissal with prejudice because of the delay. When the state charges a defendant within the applicable limitations period but fails to appoint counsel, the defendant is disadvantaged. Because the state's filing is timely, the defendant cannot move to dismiss on statute-of-limitations grounds. But, because the defendant is without counsel, defendant is still exposed to harms that result from delay that the statute is intended to protect against.

Third, the failure to appoint defense counsel can have a coercive effect. As just discussed, having an open criminal case without counsel harms a defendant because they cannot respond to the restraints on their liberty or the charges against them. Being in such a situation can put pressure on a defendant to waive their right to counsel, and that pressure mounts over time. As the burdens of having an open case without counsel grow, so does the likelihood that a defendant will waive their right to counsel just to move their case forward. Thus, an extended delay in the appointment of counsel can cause a defendant to abandon their right to counsel and proceed at a disadvantage.

As discussed above, when determining the scope of the state constitutional right to counsel, this court is guided by the principles underlying the right and the purposes of the right. It considers whether the denial of the assistance of counsel in the particular circumstances at issue would "risk prejudice to the defendant's legal interests." *Gray*, 370 Or at 130; *see also, e.g.*, *Russell*, 293 Or at 317-20 (considering

---

[13] As noted above, different crimes have different limitations periods, ranging from two years to more than 20 years, 374 Or at 829 n 5, and some crimes have no limitation period, ORS 131.125(1).

the nature of presentence interviews and how counsel could assist a defendant during an interview); *Gray*, 370 Or at 132-33 (considering how counsel could be helpful to a defendant testifying before a grand jury).

Applying that approach to the circumstances at issue here, we conclude that when, as in relator's criminal case, the state fails to appoint counsel for an eligible defendant for an extended period of time, the state violates Article I, section 11. Such a failure undermines the purposes of the right because it denies the defendant the means necessary to respond to the state's exercise of its prosecutorial powers, creates an imbalance in the adversarial system, and puts pressure on a defendant to waive the very right that is intended to help ensure the fairness and legality of criminal prosecutions.

C.   *Whether Dismissal Without Prejudice Is the Appropriate Remedy*

Having concluded that relator's Article I, section 11, right to counsel was violated, we must now determine whether relator is entitled to the remedy he requests. As a general proposition, this court tailors remedies for the violation of the right to counsel under Article I, section 11, to the nature and effects of the violation. *See, e.g.*, *State v. Stanton*, 369 Or 707, 715, 511 P3d 1 (2022) (holding that, where the record failed to establish that a defendant had made an intentional and knowing waiver of his right to counsel and the court could not determine what the outcome of the case would have been had the defendant been represented, remand for a new trial was appropriate); *Prieto-Rubio*, 359 Or at 38 (holding that, where a detective questioned a defendant in violation of Article I, section 11, the remedy was "the exclusion of any prejudicial evidence obtained as a result of that violation").

The nature of the violation in this case is unlike those that we have previously encountered. This is not a case in which the violation of the right occurred in the context of a hearing or a trial that can be conducted again. Nor is this a case in which the violation resulted in the state obtaining evidence that can be excluded. Instead, the state

arraigned relator on criminal charges but then denied him the appointed counsel to which he was entitled.

As described above, when the state maintains a criminal prosecution against a defendant while failing to appoint defense counsel for an extended period of time, the defendant is harmed in several ways. Dismissal without prejudice is an appropriate remedy for those harms. It terminates the imbalanced situation where the state is asserting its prosecutorial power over the defendant, but the defendant is without counsel to help them respond to that assertion. It also releases the pressure on a defendant to waive their right to counsel. At the same time, it does not preclude the state from prosecuting the defendant later, when the state is able to provide the counsel to which a defendant is entitled.

D.   *When Is a Trial Court Compelled to Dismiss the Criminal Charges*

Having concluded that dismissal without prejudice is an appropriate remedy, the question becomes: At what point is a defendant entitled to that dismissal? As mentioned, relator urges us to announce a bright-line rule that a defendant is entitled to dismissal after a certain number of days. We agree that, in this situation, a bright-line rule is appropriate. It will help ensure that similarly situated defendants are treated consistently across the state. And it will be a tool for courts to remedy denials of counsel efficiently.

Where the "bright line" should be set is a novel question. To answer it, we take into account the fact that the burdens and pressures of having an open case without the assistance of counsel will increase over time. As time goes on, the risks of harm to the defendant's rights and to the integrity of the proceeding increase and dismissal becomes appropriate.

We also look to the statutes that govern criminal procedures. As we discussed above, those statutes reflect that certain actions are expected to be taken early in a criminal case. *See, e.g.,* ORS 135.815 and ORS 135.845 (governing discovery); ORS 135.360 (governing demurrers); ORS 135.703

- ORS 135.709 (civil compromises); ORS 135.881-135.925 (diversion agreements). They also show that it is possible for some criminal prosecutions to be resolved relatively quickly, which indicates that maintaining an open case against a defendant for an extended period, while denying the defendant the ability to move the case forward, is unreasonable.

The time-to-disposition standards adopted by the Chief Justice in 2018 also provide guidance. *See* Oregon Judicial Department, *Time to Disposition Standards for Oregon Circuit Courts* (2018), https://www.courts.oregon.gov/rules/Pages/other.aspx (accessed January 26, 2026) (Time to Disposition Standards). The workgroup that recommended the standards was guided by the principle that they were to be "both realistic and aspirational." Time to Disposition Standards at 2. To that end, the workgroup considered "recent data from Oregon circuit courts" and "relevant statutes and rules pertaining to the timely disposition of cases in Oregon." *Id.* Separate standards were established for felony and misdemeanor cases. *Id.* at 4. The standard for misdemeanor cases is to resolve 75 percent of cases within 60 days, 90 percent within 90 days, and 98 percent within 180 days.[14] *Id.* at 4-5. The standard for felony cases is to resolve 75 percent of cases within 90 days, 90 percent within 180 days, and 98 percent within 365 days. *Id.* at 4. Our understanding is that those time standards account for the variety of different ways that criminal cases may be resolved (*e.g.*, dismissal, plea, trial), some of which may result in a faster disposition than others. The standards indicate that most cases (75 percent) are expected to be resolved in less than 60 days (misdemeanors) or 90 days (felonies).

---

[14] The Oregon Judicial Conference originally had adopted Standards for Timely Disposition in 1990. Time to Disposition Standards at 2. The 2018 standards reduced the time to disposition when compared to the 1990 standards. For felony cases, the 1990 standard was to resolve 90 percent of cases within 120 days, 98 percent within 180 days, and 100 percent within one year. Time to Disposition Standards at 3. For misdemeanor cases, the standard was the disposition of 90 percent of cases within 90 days, 98 percent within 180 days, and 100 percent within one year. *Id.* The 2018 standards appear to reflect, at least in part, changes to docket management and case processing that had occurred since 1990. Those changes included "[t]echnological advancements" that had "dramatically changed how courts process filings, schedule hearings, and track cases," which was "especially the case with the advent of electronic filing, sophisticated case and document management systems, and automated workflow." *Id.* at 2-3.

The Time to Disposition Standards are not dispositive of the length of time that a defendant may be denied counsel under Article I, section 11, before a trial court is required to remedy that denial. But they are instructive. According to the state, "[b]efore 2019, Oregon's indigent defense system—although overtaxed—was able to provide prompt legal representation to eligible criminal defendants." Thus, the 2018 standards reflect the time-to-disposition goals absent a statewide public defense crisis in which, according to OPDC, there simply are not "enough defense attorneys in the state to represent every indigent defendant" and, "at least in the near term," it will be unable promptly to appoint counsel for all indigent defendants, many of whom "may be without counsel for weeks if not months."

Viewed in that light, the state's failure to appoint a named attorney to represent an eligible criminal defendant for a period of 60 days or more in a misdemeanor case, or 90 days or more in a felony case, would be starkly inconsistent with the current dispositional standards of resolving 75 percent of misdemeanor cases within 60 days and 75 percent of felony cases within 90 days. It would leave a defendant without counsel for all or most of the time that the standards set for resolution of most criminal cases.

There must be a limit on the amount of time that the state may maintain a criminal prosecution without appointing counsel for an eligible defendant, and this case requires us to set that limit. We do so based on the pretrial harms described above; the relevant statutes and rules contemplate that some cases can be resolved at early stages of a prosecution; and the time to disposition standards reflect the goals for resolving most criminal cases within 60 or 90 days. In light of those considerations, as well as our own assessment of when the pretrial harms justify the remedy of dismissal without prejudice, we conclude that, when an eligible criminal defendant lacks appointed counsel after arraignment for a period of more than 60 consecutive days in a misdemeanor case, or 90 consecutive days in a felony case, dismissal of the criminal charges without prejudice is ordinarily required.[15]

---

[15] By "misdemeanor case," we mean a case in which the most serious crime charged is a misdemeanor. By "felony case," we mean all cases in which a felony is charged.

Applying that rule in this case, the trial court had a legal duty to grant relator's motion to dismiss because relator had been without named counsel post-arraignment for over 90 days.

## IV.  CONCLUSION

To summarize, although this case is moot, it qualifies for adjudication under ORS 14.175 because it presents questions regarding an act of a public body that is capable of repetition but likely to evade judicial review in the future, and it is appropriate for us to exercise our discretion to adjudicate it because it presents important constitutional questions that affect many cases across the state on a daily basis. Regarding those questions, we conclude that (1) the state violates Article I, section 11, if, as in relator's criminal case, it fails to appoint counsel for an eligible defendant after arraignment for an extended period of time; (2) dismissal without prejudice can be an appropriate remedy for such a failure; and (3) a defendant is entitled to that remedy when, at any point after arraignment, the state fails to appoint counsel for a period of more than 60 consecutive days in a misdemeanor case or 90 consecutive days in a felony case.

Applying those conclusions to the facts of this case, relator was entitled to mandamus relief. But, because the trial court has now dismissed the criminal case, there is no additional relief we can provide to relator.

The alternative writ of mandamus is dismissed as moot.

---

Dismissal is not required if, during the 60- or 90-day period, the defendant failed to appear for court as required.

Our decision does not foreclose a trial court from determining that there are case-specific reasons to dismiss the criminal charges against an eligible defendant who has been denied appointed named counsel post-arraignment at an earlier point. And, because we cannot foresee all the possible circumstances that may arise in the future, we leave open the possibility that, in truly extraordinary circumstances, a court could decline to dismiss a case after the 60- or 90-day period for exceptionally good cause.